STANLEY H. LOWNDES vs. DANIEL P. WICKS ET AL.

Third Judicial District, New Haven, January Term, 1897. ANDREWS, C. J.,
TORRANCE, FENN, BALDWIN and HAMERSLEY, Js.

A division fence extended into tide-water by a riparian proprietor, on a
   certain line, *prima facie* indicates a claim of title to the land under
   water on his side of the line as far out as the fence is built.

When a boundary between riparian proprietors of business property upon
   tide-water depends upon conveyances, the legal effect of which is un-
   certain, the acquiescence of one in a line claimed by the other is pre-
   sumptive evidence that such line is the true one. Nor is it of any
   consequence that the parties acted under a misapprehension of their
   legal rights.   But a boundary line which rests largely on acquiescence
   and consequent estoppel, ought not to be extended further than such
   acquiescence clearly requires.

In determining the division line between riparian proprietors on an irreg-
   ular shore, the law aims to give each, so far as may be, a fair and rea-
   sonable opportunity of access to the channel. In case of a concave
   shore a straight line should be drawn across the mouth of the bend or
   cove, from which a perpendicular line should run to the point of divi-
   sion at high-water mark, or to the offshore terminus of the division
   line, if it has been deflected and extended toward the channel by the
   acts of the adjoining owners.

Equitable defenses may be made, on an appeal from a justice of the peace,
   although they might not have been available before him.

[Argued January 20th—decided March 3d, 1897.]

ACTION for an entry on tide-water flats and a trespass by
cutting off the plaintiff's piles, brought by appeal from the
judgment of a justice of the peace to the Court of Common
Pleas for Fairfield County, and tried to the court, *Curtis, J.*;
facts found and judgment rendered for the defendants, and
appeal by the plaintiff for alleged errors in the rulings of the
court.   *Error in part.*

The following facts appeared from the finding : The plain-
tiff owned a wharf-lot on the easterly side of Five Mile river
at Rowayton in Norwalk, west of Main street, and the de-
fendants owned the next lot, on the south.   The controversy
between them was as to the limits of the riparian privileges
attaching to each lot, below high-water mark.   The upland
division line corresponded to an extension easterly to high-

water mark of the southerly line of a street called Crockett avenue, which ran into Main street, nearly at right angles, and went no further. Said upland division line was about twenty feet long.

Both lots belonged, in 1867, to Robert Godfrey. In that year he conveyed to Henry M. Hoyt and Peter Decker, the predecessors in title of the plaintiff, a parcel of land described as bounded northerly by land of one Cudlipp, easterly by land of one Knowlton, "southerly by a driftway, and westerly by a highway ; with the water privilege connected therewith, said tract containing one acre, more or less." Main street was the highway here referred to. In 1868, he conveyed to William Godfrey, the defendants' predecessor in title, a parcel of land at Five Mile river described as bounded "northerly by a driftway and land of John Crockett and William G. Crockett, easterly and southerly by land of Charles L. Raymond, and westerly by highway. Also a certain wharf-lot, situated at said Five Mile river, bounded northerly by Henry M. Hoyt and Peter Decker, easterly by highway, southerly by land of Charles L. Raymond, and westerly by Five Mile river, so-called." Main street was the highway here referred to. William Godfrey conveyed this wharf-lot, by a similar description, in 1875, to Oliver Cook, and in 1876 Cook conveyed to Charles W. Raymond, the plaintiff's predecessor in title, by a quitclaim deed, half an acre of land, more or less, bounded northerly and westerly by Five Mile river harbor, southerly by the grantor's other land, and easterly by Main street. This southerly boundary on Cook's upland was understood and intended by him to be the southerly line of Crockett avenue extended, and thereafter he occupied to that line as his northerly upland boundary. In 1875 he had built a fence from Main street in said line to a point about a board's length below high-water line, and subsequently occupied only up to said fence. This fence continued until 1889 or later, some of the posts remaining in 1891. Raymond, a few days after his deed from Cook, conveyed the land by a similar description to John H. Lowndes, and by the added description, " the same being directly in

front of said Lowndes' land." In 1889 Oliver Cook conveyed to one Thomes, land on the east side of Main street, south of Crockett avenue, "also that certain wharf-lot situated in front of and separated from the above described tract by the highway, bounded northerly by a driftway, easterly by the highway, southerly by land of Charles W. Bell, and westerly by the harbor of Five Mile river, said above described premises being known as the Godfrey property." Thomes conveyed to the defendants and one Julia L. Crockett, in October, 1891, a wharf-lot "bounded and described as follows: On the north by common land which is a continuation of Crockett avenue (so-called) to Five Mile river harbor; on the east by the highway; on the south by land of Sands Selleck, formerly belonging to said grantor; on the west by Five Mile river harbor. The south boundary of said described lot begins at a point by the highway eighty (80) feet north of the dock of said grantor, running westerly to the river." Thomes had never occupied north of the fence erected by Cook, and pointed it out to the grantees, preliminary to his conveyance to them, as the northerly boundary of the wharf-lot which he was to convey.

In December, 1891, the defendants, with the assistance of a surveyor, attempted to find their offshore line, and ranged across the flats along the line of said upland boundary line extended, and had the line so found represented on a map, and they then thought that their offshore line was thus to be found. Neither the plaintiff nor his grantor was aware of these acts.

In February, 1892, John H. Lowndes drove a pile about thirty-five feet below high-water mark, in the line of said upland dividing line extended, and from that pile drove a straight row of fourteen piles tending a little to the north of said division line extended. Said row of piles was one hundred and fifty feet in length. At the time said piles were driven the defendants knew of the same, but made no objection thereto.

In 1891 the defendants carted stone upon their wharf-lot for the purpose of building a dock. In December, 1893,

they began to build a stone dock-wall on the flats in front of their wharf-lot, building northerly from their southerly line and reaching the present line of piles, at a point sixty-seven feet below high-water line, after this suit was begun. No stone were laid north of the row of piles. After said John H. Lowndes drove said row of piles, he floated other piles along the northerly side of the same and fastened them to the driven piles. These piles were collected for the purpose of building a dock there. Some years before this, John H. Lowndes had built a dock thirty-five feet north of the said upland division line, in such a direction as to have crossed Crockett avenue, extended, if built out far enough.

In August, 1892, the defendants and said Crockett conveyed to Sands Selleck a wharf-lot " bounded and described as follows : On the north by common land, which is a continuation of Crockett avenue (so-called), to Five Mile river harbor. On the east by the highway. On the south by land of said grantee. On the west by Five Mile river harbor. The south boundary of said described lot begins at a point by the highway, eighty (80) feet north of the dock of Ephraim Thomes, running westerly to the river; being the same piece of land deeded to us by warranty deed from Ephraim Thomes, dated the first day of October, 1891." In August, 1893, Selleck conveyed to the City National Bank of South Norwalk a tract of land described as " bounded easterly one hundred and twenty (120) feet by highway, southerly by land of E. Thomes, westerly by Five Mile river harbor, and northerly by land of John H. Lowndes." In December, 1893, the bank conveyed to the defendants a tract of land described as " all that land lying north of a line drawn from a point on highway, ninety-one (91) feet north of E. Thomes' coal dock, to a point ninety-one (91) feet north of said coal dock on Five Mile river, being triangular in shape, and the point being spiles of John Lowndes, as now set; bounded easterly on highway sixty-seven (67) feet, more or less, southerly by other land of City National Bank, and westerly by land of John H. Lowndes." On January 2d, 1894, the defendants conveyed to the bank a tract described as " all

that tract of land lying north of a line drawn from a point on the highway, ninety-one feet north of E. Thomes coal dock, to a point ninety-one feet north of said coal dock on Five Mile river, being triangular in shape, and the point being spiles of John Lowndes, as now set; bounded northerly by land of John H. Lowndes, easterly on the highway, sixty-seven feet, more or less, and southerly by land of the said grantee;" and the bank immediately conveyed to them a tract of land described as "being seventy-two feet and eight inches in front on the highway, more or less, and bounded northerly by land of John H. Lowndes, easterly by the highway, southerly by other land of said grantor, and westerly by the Five Mile River harbor; said southerly boundary line being more particularly described as follows: Commencing at a point on the harbor line, where a pile is now driven, seventy-five feet northerly from the northwest corner of dock belonging to Ephraim Thomes, thence extending in an easterly direction to a point on the highway eighty-five feet and six inches distant from said dock of Ephraim Thomes." On January 6th, 1894, John H. Lowndes conveyed to the plaintiff a tract of land described as "bounded northerly by my other lands, easterly by highway, southerly by land now or late of the City National Bank, of South Norwalk, and westerly by the channel of the river or harbor line; said tract being 34–2 feet in width." At this time the defendants were in possession of their wharf-lot as they had been ever since their deed of the preceding December.

Immediately after January 6th, 1894, the plaintiff took up all the piles his grantor had driven, except those at each end of said row, and forthwith drove new piles along said line and extended said line of piles westerly about 40 feet, until the same met the dock of Charles Lowndes, and thus cut off the defendants' upland from access to the harbor.

Said Charles Lowndes' dock was built some time between February, 1892, and January, 1894, along the defendants' southerly line, but by what right or under what title did not appear. The Thomes dock was built before December, 1891.

The plaintiff placed caps along the top of said row of piles. The defendants protested against the driving of said piles by the plaintiff, both along the old line and the extended line, claiming that by so doing he was "robbing them of their rights," and cutting them off from access to the harbor. The plaintiff then refused to permit them to show him what they claimed, and was not influenced in any action he took after their protest by any claim made by them or any failure to make a claim.    On January 29th, 1894, and again on February 1st, 1894, the defendants went upon said row of piles and cut the capping.   Each of these acts was the subject of a separate count.   Said cutting was a reasonable and suitable means of removing said capping.   The same was injured on each occasion to the amount of $5.   The plaintiff on the dates last aforesaid was so far in possession of the *locus* as the facts above stated indicate.

The United States government has dug a channel and in January, 1892, it established a harbor line in said Five Mile River harbor.   There was originally no deep channel in the river at low tide, but only a mere thread of water ten feet or so wide, in portions not navigable for skiffs.   At extreme low tide it was fresh water, draining through.   The channel so dug by the government includes this thread and corresponds with its direction.   The present southerly line of Crockett avenue is a little south of, but parallel with, the original line.   The general trend of the easterly shore line of Five Mile River harbor, taking a considerable distance into account and omitting to notice small indentations and projections, is parallel to the harbor line established by the government.   A line drawn at right angles to said harbor line (and hence to the said trend of the shore) from the point of intersection of the defendants' northerly boundary line on the upland and the high-water or shore line, runs to the north of said row of piles driven by the plaintiff.   A line drawn from the point of intersection of the defendants' northerly boundary line on the upland and the high-water line, perpendicular to the course of the channel as it tends southerly from in front of said Crockett avenue—said line not meeting said channel

at right angles as the same actually exists, but meeting the said course of the same extended northerly—runs northerly of said line of piles driven by the plaintiff. If a perpendicular line be drawn across the flats from the line joining the corners of the plaintiff's land on the shore, and also on the line joining the defendants' land on the shore, from their point of intersection, and the space between those lines be equally divided between the parties, then said row of piles driven by the plaintiff will be upon the portion of the defendants'. The course of the channel follows substantially the old drain or channel of the harbor. The water frontage above and below the upland dividing line of said parties has been used by the parties, and by the people of that vicinity, as a landing place for boats and other general uses of watermen, until within a few years. Since said row of piles was driven in 1892, the frontage north of the same has not been so used.

From the foregoing facts, it was further found that there had been no title gained by adverse possession for fifteen years, by either of said parties, or their predecessors in the chain of title, to the flats lying in front or in the immediate vicinity of their dividing line over the upland. None of the successive owners of the two tracts have agreed upon a dividing line across the flats from their upland boundary line, unless the facts herein set forth constitute an agreement.

The plaintiff claimed, (1) that upon the foregoing facts he was in possession of the *locus* at the time of the trespass, and so was entitled to judgment on both counts, unless the defendants had proved paramount title; (2) that the defendants were confined in their proof of title to boundaries ascertained in one of the two ways specified in their second or third defense; (3) that upon the facts, the line of piles was not south of such a division line between the parties as the law would have established in the absence of an establishment by the parties themselves; (4) that upon the facts, the parties and their predecessors in title had fixed the division line across the flats as the southerly line of Crockett avenue extended, and that the same should be adopted in this case; (5) that the deed of January 2d from the City National

Bank to the defendants, could not convey to them any title north of the line of piles; (6) that the defendants were estopped by their own acts and the acts of their grantors to claim title north of that line; and (7) that the title of the defendants and their grantors, if it ever existed, had been lost by adverse possession.

The second defense alleged that "the northerly and southerly boundary lines of the defendants' said riparian lot, are lines drawn at right angles to the said harbor line to respectively the northerly and southerly extremities of the easterly boundary line." The third defense alleged that "the northerly and southerly boundary lines of defendants' said wharfing-lot are at right angles to the general course or channel of the river, and run from the northerly and southerly extremities respectively of the easterly boundary line." In each defense, the easterly boundary was described as being the highway known as Main street. These defenses were denied.

The court found all the issues for the defendants, and ruled that the precise line of division, which the law recognized as existing since 1867–8 over the flats, between the lands of the parties, was a line at right angles to the general trend of the shore; that this line was north of the row of piles; that possession follows the title of unoccupied flats, and so the defendants and their predecessors in title were in possession up to said line until February, 1892, at least; that the plaintiff and his grantor, since February 1st, 1892, had held possession up to said line of division so far as to the end of the 1892 line of piles; that since February, 1892, no conveyance of the land north of the line of piles could be made by any other party, as it would be void under the statute against conveying pretended titles (General Statutes, § 2966); that none of the successive owners of the two tracts had ever agreed upon a dividing line below high-water mark, unless the facts specially found constituted an agreement; that the true division line on the flats was north of the 1892 line of piles, and the plaintiff, or his grantor, was in possession of the flats between the 1892 line of piles and the true

line from August 1st, 1892, till January 2d, 1894, inclusive, while the title was in the defendants and Julia L. Crockett, as joint tenants; that in February, 1894, when the alleged trespasses were committed, the defendants owned the fee south of the 1892 line, and were joint tenants in the flats north of said line up to the true division line, thus having the rights of an owner of the fee; and so that they could not be regarded as trespassers.

*Levi Warner*, for the appellant (plaintiff).

*J. Belden Hurlbutt* and *H. Whitmore Gregory*, for the appellees (defendants).

BALDWIN, J.   The only matter in dispute in this action is the proper division of the riparian rights appurtenant to two adjoining wharf-lots, lying on the west side of Main street in Rowayton, with a water front on Five Mile river harbor. These lots, so far as the upland is concerned, extend for a distance of about twenty feet from Main street, and the boundary between them on this upland is the south line of Crockett avenue extended, which line crosses Main street substantially at right angles.   Crockett avenue formerly was a driftway, and it would appear from the conveyances under which the defendants claim, that this driftway was regarded by some of the grantors as extending across Main street and making the soil under it common land.   The upland division line was continued in the same line by a board fence for a distance of a few feet below high-water mark.

In 1892 the plaintiff's grantor built a row of piles from a point thirty-five feet below high-water mark in what was an extension of this line, running a little north of such extension to within about forty feet of a harbor line which had been established, a few weeks before, by the United States, near the channel of the river.   Until that time, the water front immediately north of the fence line had been used by the public as a common landing place.   After that time, such use ceased.   The plaintiff's grantor, after that time, also fas-

tened a number of floating piles to the row of standing piles, on its north side, which he brought together for the purpose of building a dock there. In 1894, while the defendants were in possession of their wharf-lot, the plaintiff received a conveyance from his grantor, and immediately took up all the piles in this row except the end ones, and replaced them by others, set on the same line; at the same time extending the row towards the channel about forty feet, to a point where it met the dock of a third party, and so cut off the defendants' upland from any access to the harbor. The defendants thereupon cut the capping on some of these piles, and the Court of Common Pleas has found that the plaintiff was at the time so far in possession as the facts specially found indicate.

Those facts appear to us to indicate and establish his possession of the flats below high-water mark as far south as the row of piles. That row constituted the dividing line of possession, and the defendants committed a trespass upon it, unless their defense of title has been made out. They pleaded title to the *locus in quo*, setting up in their second defense, that their northerly boundary was a line drawn at right angles to the harbor line from the northerly extremity of their frontage on Main street, and in their third defense that it was a line drawn from the latter point at right angles to the general course of the channel of the river.

The first conveyance in the chain of title of either party which describes the northerly boundary line of the defendants' tract with any attempt at precision, is that to the defendants from the City National Bank, in December, 1893, of a triangular parcel, the base of which was the Main street frontage of about sixty-seven feet, the apex of which was a point ninety-one. feet north of E. Thomes' coal dock, " being spiles of John Lowndes, as now set," and which was bounded " westerly by land of John H. Lowndes." A few days afterwards, these premises were released to the bank by a deed containing similar words of description, except that an obvious error was corrected by substituting " northerly " for " westerly " as the direction of the land of John H. Lowndes. The bank immediately executed to the defendants another convey-

ance of a quadrilateral tract, with a frontage of about seventy-two feet on Main street, a southerly boundary precisely ascertained, a northerly boundary described simply as on land of John H. Lowndes, and a westerly boundary on the harbor. This description of the northerly boundary must be taken to refer to the same boundary described in the release deed from the defendants, of the same date, so far as the latter extended from Main street to that point in the row of piles which formed the apex of the triangle particularly identified in the former conveyance to them; for this last deed of the bank conveys whatever it had to convey north of the tract which it retained; and its original purchase from Sands Selleck, as well as the lot so released, was bounded in that direction by the land of John H. Lowndes.

The established harbor line is found to correspond in direction with the general course of the channel of the river, as well as with the general trend of the shore line. The plaintiff, therefore, was called upon, by the second and third defenses alike, to meet a claim of title on the part of the defendants to the lands and flats south of a line drawn from the northerly end of their frontage on Main street (which was a well ascertained point), at right angles to the harbor line, and so also to the shore line. Such a line runs north of the row of piles; and as the shore line at the place in question is shown by the maps, which form part of the finding, to be part of a broad, concave curve, embracing the harbor, would constitute the northerly side of a triangular parcel of land and flats, of which the lines of the piling and upland fence formed the southerly side, and the base was upon the channel of the river.

The burden of supporting this defense of title was on the defendants, and they failed to establish it unless it is made out as matter of law, from the conveyances which are spread upon the record. The Court of Common Pleas was of opinion that it was so made out from the original conveyances by Robert Godfrey, who at one time owned the entire tract now divided between the parties. This position was based upon the legal operation of the description in Godfrey's deed

to the defendants' predecessor in title, of the premises conveyed, as "bounded northerly by Henry M. Hoyt and Peter Decker," who were the predecessors in title of the plaintiff; the view taken being that the generality of this description left the precise location of the northerly boundary to be determined by the rules of law, and that these rules made it a line drawn at right angles to the general trend of the shore.

The deed from Robert Godfrey to Hoyt and Decker, in 1867, bounded their land on the east of Main street "southerly by a driftway," which was the way afterwards known as Crockett avenue; and when Oliver Cook, who had acquired title to the southerly wharf-lot, as "bounded northerly by Henry M. Hoyt and Peter Decker,"—after running a fence from Main street to a point several feet below high-water mark, on the south line of Crockett avenue extended, —gave his release deed to Raymond, the plaintiff's predecessor in title, in 1876, and described the premises released as bounded northerly by Five Mile River harbor, and southerly on his own land, it is found that both parties understood the latter boundary, so far as the upland west of Main street was concerned, to be this south line of Crockett avenue extended. It is also found that when Raymond, a few days afterwards, conveyed to John H. Lowndes, he described the wharf-lot as being "directly in front of" the latter's land, that is, the land of Lowndes on the east side of Main street, bordering on the driftway or Crockett avenue. The Cook fence, also, was pointed out to the defendants as the northerly boundary of the upland to be conveyed to them, at the time of their purchase from Thomes, in 1891.

In view of this long established upland boundary between the lots of the parties west of Main street, it is obvious that no straight line can be run from Main street towards the channel to limit the riparian privileges of the plaintiff, which does not coincide with the southerly line of Crockett avenue extended; for the latter is a straight line beginning at the northernmost point in the Main street frontage of the defendants' lot, and the Cook fence followed it precisely to the shore. Neither of the lines claimed by the defendants'

answer, therefore, can be supported; for each is a perpendicular beginning on Main street, at a point in the south line of Crockett avenue extended, and running out into the harbor, north of the latter line.

Notwithstanding this, however, their claim of title would be maintained, if they have made out their northerly boundary to be a perpendicular from the point where the upland division line between the parties meets the water, which runs northerly of the *locus in quo*, and yet falls within the perpendicular described in their answer. Their position would then be simply that of one claiming more than it is necessary to prove.

The trial court finds that three such perpendiculars may be run. But the initial point from which they are made to proceed does not appear on the proofs to be the proper center of radiation.

The fence to which reference has been made, built in 1875 by Oliver Cook (under whom each party claims), in the south line of Crockett avenue, extended not only to high-water mark, but "a board's length" beyond. This fence continued in position until 1889, and some of the posts until 1891. It marked the line of possession of all the defendants' predecessors in title, and was pointed out to them in 1891 as the boundary line of the wharf-lot, by their immediate grantor, before he made his conveyance. Two months later, they had an extension of this line to the channel mapped out by a surveyor, as marking the limit of their riparian privileges. Clearly, under these circumstances, no perpendicular could be run from any point east of that which was "a board's length" west of high-water mark. To that extent, the south line of Crockett avenue extended, by the acts of Cook and the acquiescence of all concerned, had become the dividing line both of possession and title.

The plaintiff's lot is described in his deed as about thirty-four feet wide. In 1894, when he acquired title, its southerly boundary was determined by the southerly line of Crockett avenue extended to a point thirty-five feet below high-water mark, and thence by the row of piles set in 1892,

so far as they ran out. If his grantor originally owned the flats south of this row of piles, to the line of Crockett avenue extended, he did not, because he could not, convey them; since the defendants were in possession up to the row of piles. General Statutes, § 2966.

A division fence run into tide-water by a riparian proprietor, on a certain line, *prima facie* indicates a claim of title to the land under water on his side of the line as far out as the fence extends. When John H. Lowndes in 1892 set the pile in the line of the fence thirty-five feet below low-water mark, he thereby claimed title to that point; and when he ran out the row of piles thence in a line deflecting southerly, he thereby claimed title to the new line thus marked, and no farther. The subsequent conveyances of the adjoining tract showed an acquiescence on the part of its owners in the boundary thus established. That of August, 1892, from the defendants and Julia L. Crockett to Sands Selleck, bounded the premises "north by common land, which is a continuation of Crockett avenue (so-called), to Five Mile river harbor." This evidently did not purport to convey anything north of the south line of Crockett avenue extended. In the deed of December 27th, 1893, from the bank to the defendants, the row of piles is not only expressly named in defining the boundary upon land of John H. Lowndes, but named in a way that indicates that the outer end of the row was the outer limit of the granted premises. Such, also, would appear to be the case from the maps which are sent up as part of the record.

When a boundary between adjoining proprietors depends upon conveyances the legal effect of which is uncertain, the acquiescence of one in a line claimed by the other is presumptive evidence that it is the true one. *French* v. *Pearce*, 8 Conn. 439. Nor is it of any consequence that the parties acted under a misapprehension of their legal rights. *Rathbun* v. *Geer*, 64 Conn. 421, 424. Considerations of this character have especial weight in the determination of controversies between riparian proprietors of business property on tide-water. The shore line is liable to constant changes from the construction of new

embankments and wharves, as well as from the dumping of rubbish with no other purpose than to get rid of it. Lands reclaimed, if the State interposes no objection, are treated as additions to the original upland, and as affording a similar point of departure for further extensions. Harbor lines may be established and altered by public authority, in view of the apparent conditions existing at the time, with respect to wharves and docks or other monuments. It is a matter of common knowledge that in a period of time far less than that necessary for the establishment of a title by adverse possession, the whole face of a harbor front may be so changed by riparian improvements or encroachments as to make it almost impossible to trace out the lines of the original shore.

The row of piles which John H. Lowndes ran out in February, 1892, was a structure of a permanent and somewhat expensive character. For nearly two years it stood with the knowledge of the defendants or their grantors, and without objection. It was referred to as constituting a bound in two of the deeds forming part of their chain of title. It was too late for them, after his conveyance to a third party of the narrow strip of land adjoining it on the north, to assert, for the first time, a paramount title, under which they could wharf out over this strip in such a way as to cut it off from access to the channel; and such would be the effect of either of the lines claimed in their answer.

It does not, however, follow that the defendants were trespassers to the extent alleged in the complaint. A boundary resting so largely on acquiescence and consequent estoppel ought not to be extended further than such acquiescence clearly requires. The division line between the parties has been established by their acts and those of their predecessors in title, as far towards the channel as the end of the row of piles set by John H. Lowndes in 1892. Beyond that point, no actual possession was taken by any one, prior to the acts of the plaintiff in resetting and extending the piling, in 1894, to which prompt objection was made. The dividing line thence to the channel has been left to be established by the rules of law. It is the aim of these rules, as applied to the rights of

adjoining riparian proprietors on an irregular shore, to give each, as far as may be, a fair and reasonable opportunity of access to the channel. For a convex shore, the proper rule was stated in *Morris* v. *Beardsley*, 54 Conn. 338, 341. The converse of this rule, for similar reasons, governs the case of a concave shore. A straight line must be drawn across the mouth of the bend or cove, and a perpendicular line run from this to the point where the row of piles ended which was set in 1892. The riparian privileges attached to the flats lying next north of this perpendicular belong to the plaintiff; those attaching to the flats lying next south of it belong to the defendants.

An inspection of the government map shows that this line is coincident with the harbor line. The division line, therefore, is one perpendicular to the harbor line.*

The defendants have contended that the plaintiff, unless he has made out a title by adverse possession, can claim nothing south of such a line as the law marked out between the original grantees of Robert Godfrey, when he divided his wharf-lot with its riparian privileges into two parcels, and bounded each simply on the other. We have no occasion to inquire whether such a rule would have necessarily governed the case, when originally tried before the justice of the peace. On the appeal to the Court of Common Pleas the controversy came before a tribunal having equitable as well as legal jurisdiction, and bound to prefer the rules of equity to those of the common law, should they be found in conflict with reference to the title of either party. General Statutes, § 877. The equitable doctrine of acquiescence applies in full force to this case. It has been well defined as quiescence under such circumstances that assent may be reasonably inferred from it. 2 Pomeroy's Equity Jurisprudence, § 965, and note. Assent thus given is as irrevocable as if expressly stated in words. Such, in equity, was the assent given by the defendants and their predecessors in title to the successive acts by which the plaintiff's predecessors in title had marked

---

* The sketch on p. 31 will make the position of this line plain.

in part the boundary in question. Assent is a necessary inference from acquiescence, and estoppel was the necessary consequence of assent.

The Court of Common Pleas therefore erred in overruling altogether the fourth and sixth claims made by the plaintiff

upon the trial. They were correct so far as they asserted that the south line of Crockett avenue, extended, had, by the acts of the parties, been fixed as the true line of division, to the point where the row of piles commenced which was set in 1892, and that the defendants were estopped from setting up title to the flats lying next north of that piling. One of the acts complained of was committed in cutting the capping of these piles; the other in cutting the capping of the new piling, between these and the harbor line, set by the plaintiff, himself, in 1894. The former was a trespass. The latter was not; for the *locus in quo* was south of a perpendicular drawn from the end of the old row of piles to the harbor line.

There is error in the judgment appealed from, and it is reversed, and the cause remanded, with instructions to enter judgment for five dollars damages in favor of the plaintiff on the first count, and for the defendants on the second count.

In this opinion the other judges concurred.

