ROBERT DELBUONO, TRUSTEE, ET AL. *v.* BROWN BOAT WORKS, INC.
(AC 15774)

Heiman, Spear and Glass, Js.

---

Argued October 29, 1996—officially released June 24, 1997

*William F. Gallagher*, with whom were *Robert K. Marzik* and, on the brief, *Cynthia C. Bott*, for the appellant (defendant).

*Thomas P. Weldy,* for the appellees (plaintiffs).

*Opinion*

SPEAR, J. This declaratory judgment action was brought to determine the littoral rights of the plaintiffs and the defendant, whose adjoining properties border the Housatonic River in Stratford. Central to the dispute is a row of piles driven by the defendant in the early 1960s that intrude into the water in front of the plaintiffs' property. On appeal, the defendant claims that in determining the parties' littoral boundary line the trial court improperly (1) failed to find an express agreement between the parties setting the littoral boundary along a line defined by the row of piles, (2) failed to find that the defendant's longtime use and development of the disputed area of water established the littoral boundary line pursuant to the doctrine of equitable acquiescence, and (3) failed to select the proper headlands and terminus of the parties' upland boundary line in employing the cove method to determine the littoral boundary line. We affirm the judgment of the trial court.

Before turning to the facts, we restate two established tenets concerning littoral rights and set out how the cove method is applied to resolve littoral boundary line disputes. First, the owner of land abutting the water owns to the mean high watermark and the public, i.e., the state, owns the property between the high and low watermarks on navigable water where the tide ebbs and flows. See *Rochester* v. *Barney,* 117 Conn. 462, 468–69, 169 A. 45 (1933). Second, "owners of adjoining upland have the exclusive, yet qualified, right and privilege to dig channels and wharf out from the owner's land in a manner that does not interfere with free navigation." *Water Street Associates Ltd. Partnership* v. *Innopak Plastics Corp.,* 230 Conn. 764, 769, 646 A.2d 790 (1994). The plaintiffs claim that the row of piles and the defendant's docks encroach on their littoral rights

and interfere with their right and ability to extend wharfs from their property.

Where there is a dispute between adjoining landowners over their littoral rights and the relevant shoreline is concave, our courts employ the cove method to resolve the dispute. The court first selects two points on the opposite sides of the mouth of the cove (headlands) and draws a straight line between them. This line is referred to as the baseline or chord. A straight line is then drawn perpendicular from the chord to the parties' boundary line at the high watermark. The perpendicular line is the littoral boundary line, and each party may exercise littoral rights on its side of the line. See *Rochester* v. *Barney*, supra, 117 Conn. 469–70.

The trial court found the following facts. The plaintiffs Robert DelBuono and Irene DelBuono, as trustees of the Robert DelBuono revocable trust, are the owners of land in Stratford on the west shore of the Housatonic River. The defendant, Brown Boat Works, Inc., is the owner of adjacent riverfront property south of the plaintiffs' property. The boundary that separates the parties' properties is 25.48 feet long and runs generally northeast to the mean high watermark.

The parties' expert witnesses agreed that the shoreline is concave and that the cove method should be employed to determine the littoral boundary line between the properties. The headlands are the Stratford town dock to the south of the properties and the property of Stratford Marina to the north. The littoral boundary line is shown on the plaintiffs' exhibit (see diagram following page) as bearing N 82 degrees 10' 26".

After establishing the littoral boundary line, the court issued a permanent injunction restraining the defendant from the construction, use or maintenance of piles,

bulkheads, piers or docks that encroach on or violate in any manner the littoral rights of the plaintiffs. This appeal followed.

## I

## THE CLAIMED AGREEMENT

### A

The defendant first claims that the trial court improperly failed to find an express agreement concerning the parties' littoral boundary line. We disagree.

The defendant bases its claims on the following evidence. On May 14, 1960, the defendant applied to the water resources commission (commission)[1] for a permit to install a bulkhead on its property. On May 16, 1960, the plaintiff Robert DelBuono applied to the commission for a permit to construct a bulkhead on his property. The commission sent a letter to each party stating that it would take no action on either application until the parties resolved an apparent boundary dispute and agreed on the exercise of their respective littoral rights.[2] A letter from Attorney John Bigley to the commission dated August 30, 1960, and signed by Robert DelBuono and Andrew J. Brown, then the proprietor of the defendant company, stated that "[t]he ambiguity regarding property lines [has] been satisfactorily cleared by my client and Mr. DelBuono."[3]

After receipt of the August 30, 1960 letter, the commission issued each party a permit to do the work described in each application. The defendant claims that the Bigley letter and the attached diagram constitute an agreement that sets the littoral boundary line between the parties as shown on a certain map desig-

[1] The commission is now part of the department of environmental protection.

[2] In a letter dated July 11, 1960, Willis J. Snow of the commission stated to Andrew J. Brown, then the proprietor of the defendant company: "May we suggest that you and Mr. DelBuono come to some agreement concerning your common boundary in the exercise of your littoral or riparian rights. If such an agreement can be reached we shall be prepared to issue certificates for the respective pieces of work." In a letter of the same date, to Robert DelBuono, Snow stated, "may we suggest that you and Mr. Brown endeavor to arrive at a mutual agreement with respect to your common boundary and the exercise of your respective littoral or riparian rights. As soon as such an agreement has been reached we shall complete the processing of your application."

[3] The letter continues in pertinent part: "The confusion arose out of the enclosed diagram. You will note a red 'X' superimposed on the diagram. The bulkhead as set forth on this diagram is incorrect. The 84.0 feet located directly above the red 'X' should be 68.2 feet because the bulkhead does not extend into the water as the enclosed diagram indicates. The red 'X' indicates the end of Mr. Brown's property. . . ."

nated "map of property for Andrew J. Brown, Stratford, Connecticut. August 25, 1958. No. 1127." This map was recorded in the Stratford town clerk's office on September 12, 1958, and shows a line that the defendant claims is the littoral boundary line agreed to by the parties. The defendant further asserts that the commission would not have issued the permits if the parties had not agreed on the boundary line.

Resolution of the defendant's claim requires us to examine the letter and diagram to determine whether they indeed constitute an agreement as to the littoral boundary line between the parties' properties. "Where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Internal quotation marks omitted.) *Bank of Boston Connecticut* v. *Schlessinger*, 220 Conn. 152, 158, 595 A.2d 872 (1991). "The interpretation of a contract term that is not so clear as to render its interpretation a matter of law is a question of fact, subject to the clearly erroneous standard of review. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported." (Citations omitted; internal quotation marks omitted.) *Larson* v. *Jacobson*, 38 Conn. App. 186, 189, 659 A.2d 753 (1995).

The letter and diagram on which the defendant relies do not contain definitive contract language and are not clear as to what, if anything, the parties agreed to with respect to the littoral boundary line. We thus review the question of the parties' intent pursuant to the clearly erroneous standard.

The Bigley letter does not refer to a littoral boundary line, nor does the attached sketch clearly depict such

a boundary line. Neither the letter nor the sketch refers to map 1127, which was recorded in 1958 and shows a line pursuant to which the defendant *claimed* "riparian rights." We also note that the letter clearly states that the bulkhead depicted does not extend into the water. There was no evidence that the parties did anything more than agree that work on a certain shoreline bulkhead could be done on the properties in agreed areas.

We cannot say that the trial court's refusal to find that the parties agreed on a littoral boundary line was clearly erroneous.

B

The defendant also claims that the trial court failed to enforce the agreement because it mistakenly believed that it was the responsibility of an appropriate government agency to establish the littoral boundary line and that such line could not be established by agreement of the parties.[4] Because this claim presumes an agreement, such an error would be harmful to the defendant only if the trial court had found that an agreement did exist, but refused to enforce it because no government agency had approved the agreement or established a boundary line in reliance on it. Because the trial court did not

[4] The court's entire discussion of this issue is contained in the following: "In an attempt to claim the establishment of mutual boundaries by agreement, the defendant introduced various correspondences between the plaintiff, defendant and the state of Connecticut water resources commission, department of environmental protection and the Department of the Army Corps of Engineers. The introduction of these letters was an effort to establish that these state and federal agencies, by mutual agreement of the parties, had established the common boundary and the littoral rights of the plaintiff and the defendant. The defendant maintains that the plaintiff, through his conduct since the 1960s alleged agreement, acquiesced to the dimension and boundaries set forth on map 1127. Various permits from governmental agencies were introduced, authorizing bulkheads, floats, piers, ramps, etc. However, no evidence was introduced to clearly show that any governmental agency had established an upland boundary or a littoral boundary line between the plaintiff and the defendant."

find the existence of an agreement, even a mistaken belief by the trial court that government approval was necessary was harmless error.

Moreover, when examined in the context of the references to the parties' establishing the boundary line by agreement, the court's reference to government agencies makes its discussion ambiguous.[5] We cannot determine whether the court required the defendant to prove an agreement between the parties *and* an acceptance of that agreement by a government agency, or whether the court believed that a government agency must establish the boundary line regardless of whether there was an agreement. We read an ambiguous record to support rather than to undermine the trial court judgment. *DiNapoli* v. *Cooke*, 43 Conn. App. 419, 425, 682 A.2d 603, cert. denied, 239 Conn. 951, 686 A.2d 124 (1996); *Albuquerque* v. *Albuquerque*, 42 Conn. App. 284, 291, 679 A.2d 962 (1996).

## II

## THE ACQUIESCENCE CLAIM

The defendant claims that even if the trial court properly refused to find an express agreement as to the littoral boundary line, the plaintiffs' acquiescence for over twenty years in the defendant's use and development of the disputed area of water should be deemed to be acquiescence in the defendant's claimed littoral boundary line. The defendant asserts that the plaintiffs should be estopped from pursuing their claim pursuant to the doctrine of equitable acquiescence. We are unpersuaded.

---

[5] While the trial court did not expressly find that the defendant had failed to prove the existence of an agreement, in finding that the littoral boundary line was other than the claimed agreed line, the trial court implicitly rejected the defendant's claim. The defendant did not request an articulation on this issue from the trial court.

"The doctrine of recognition of and acquiescence in a boundary line is upheld by many authorities. It is sometimes referred to as acquiescence in, or as a practical location of, or as an implied agreement as to, a boundary. Considering all of the various jurisdictions in the United States, the doctrine is still in a chaotic condition . . . . Some of the authorities consider long acquiescence only as evidence of a boundary which may be contradicted. Other authorities say that an agreement may be inferred or presumed from such acquiescence. The doctrine seems to occupy a middle ground between adverse possession and estoppel in pais." Annot., 69 A.L.R. 1431 (1930).

The defendant relies primarily on *Lowndes* v. *Wicks*, 69 Conn. 15, 30, 36 A. 1072 (1897), which defines the doctrine of equitable acquiescence as "quiescence under such circumstances that assent may be reasonably inferred from it. . . . Assent thus given is as irrevocable as if expressly stated . . . ." (Citation omitted.) In *Lowndes*, a waterfront landowner drove a row of piles that extended beyond the high watermark and angled in front of the adjoining landowner's property. The Supreme Court noted that "[t]he row of piles which John H. Lowndes ran out . . . was a structure of a permanent and somewhat expensive character. For nearly two years it stood with the knowledge of the defendants or their grantors, and without objection. It was referred to as constituting a boundary in two of the deeds forming part of their chain of title. It was too late for them, after his conveyance to a third party of the narrow strip of land adjoining it on the north, to assert, for the first time, a paramount title, under which they could wharf out over this strip in such a way as to cut it off from access to the channel . . . ." Id., 29. Our Supreme Court affirmed the setting of the littoral boundary line along the row of piles and stated that

"[t]he equitable doctrine of acquiescence applies in full force to this case." Id., 30.

The defendant asserts that the following evidence supports its claim of acquiescence: (1) the defendant drove several piles that angled in front of the plaintiffs' property in the early 1960s and those piles remain there to the present time, (2) the defendant installed docks in the mid1970s that occupied part of the disputed area of water without objection by the plaintiffs, (3) the plaintiffs received notice of the defendant's applications for permits to do work on the docks in 1975 and failed to object, even though the applications showed the defendant's claimed littoral boundary line as depicted on map 1127, (4) the defendant withdrew his objection to a 1980 application for permits to do certain work on the docks, which application again showed the defendant's claimed littoral boundary line as depicted on map 1127, (5) the plaintiff Robert DelBuono's application to perform certain dredging operations was accompanied by a diagram of the plaintiffs' claimed littoral area and that diagram implicitly recognized the defendant's claimed rights by excluding the disputed area, (6) the plaintiffs implicitly recognized the defendant's claim to the disputed area by extending a small wooden dock on their southeast property line only to the littoral boundary line claimed by the defendant as depicted on map 1127, (7) during earlier litigation between the plaintiffs and a contract purchaser of the plaintiffs' property, the plaintiffs' then attorney admitted that the disputed area belonged to the defendant, and (8) the plaintiffs' attorney made the same admission during the trial of this case.

The trial court did not find facts or draw conclusions of law with respect to this claim, but it refused to adopt the claimed line pursuant to the alleged acquiescence of the plaintiffs. The defendant did not request an articulation, but asserts that the *only* conclusion that could

be reached on the basis of the evidence before the trial court was that the doctrine of equitable acquiescence applies. The defendant asserts that the court's failure to so find is clearly erroneous. We disagree.[6]

The trial court had sound reasons for rejecting this claim. There was evidence that the plaintiff Robert Del-Buono objected to the piles immediately after he first saw them and continued to object to the piles, the development of the docks and the defendant's encroachment until the death of Andrew Brown, Sr., in 1979. Brown, Sr., was the principal of the defendant company from the time the piles were driven until his death. The defendant claims that Robert DelBuono was not credible for a number of reasons, but it is axiomatic that the trier of the facts is the sole judge of the credibility of witnesses.[7] The trial court could reasonably have rejected the acquiescence claim on the basis of the testimony of Robert DelBuono. Such a rejection would preclude the application of *Lowndes* because in *Lowndes* there was no objection to the installation of the piles.

We also note that there were other reasons for the trial court to reject the evidence proffered by the defendant. With respect to the defendant's 1975 and 1980 applications for permits to construct the docks and floats, Robert DelBuono testified that he did not object to the authorities because he consistently told

[6] The alleged failure of the trial court to make the subsidiary factual findings that are necessary to support a party's claim is subject to the clearly erroneous standard of review. See *Vezina* v. *Nautilus Pools, Inc.*, 27 Conn. App. 810, 817, 610 A.2d 1312 (1992); *Ruwet-Sibley Equipment Corp.* v. *Stebbins*, 15 Conn. App. 21, 26, 542 A.2d 1171, cert. dismissed, 209 Conn. 806, 548 A.2d 437 (1988).

[7] Although the trial court made no specific findings on the issue of equitable acquiescence, the court did note that it found credible Robert DelBuono's testimony that he told Andrew Brown, Sr., that the piles could remain in place even though they were on his property, subject to one or both properties being purchased for development in the future.

Andrew Brown that the piles and docks intruded into his water space, but could remain in place until the time came when the matter of littoral rights between the parties would have to be resolved. Robert DelBuono testified that the application that the plaintiffs submitted as part of a dredging application delineated dredging only to the line claimed by the defendant because of the ongoing dispute and not because of acquiescence. With respect to the claimed admissions by the plaintiffs' counsel, the zoning application, in which the claimed admission was supposedly made, was never introduced into evidence. Furthermore, the defendant does not cite to any transcript pages that show an admission by counsel and our review of the transcript reveals none.

We have found relatively few cases discussing the acquiescence doctrine in the context of a littoral boundary dispute. The following cases offer useful insights.

In *Huguenot Yacht Club* v. *Lion*, 43 Misc. 2d 141, 250 N.Y.S.2d 548 (1964), the court rejected a claim similar to the one the defendant makes here. The court determined that the plaintiff yacht club's longtime use of the west side of its dock, a use that infringed on the adjoining owner's littoral rights, did not give the plaintiff a right to use the west side of the dock. The defendant had the right to extend a wharf from his property and adjacent to the plaintiff's dock even though the wharf blocked the longstanding use by the plaintiff of the west side of its dock.

The plaintiff in *Huguenot Yacht Club* argued unsuccessfully that the littoral boundary line was not the upland boundary line extended, but a line drawn from a point where the seawalls in front of the respective properties met. Such a line would have included the west side of the dock as part of the plaintiff's littoral rights area. The court rejected this contention, stating that a 1930 agreement of the parties that the littoral boundary line

was the upland boundary line extended was not changed by the location of the seawalls. The court also rejected the claim that the plaintiff acquired rights by its long-standing use of the west side of its dock.

*Huguenot Yacht Club* is instructive for the principle that once an upland owner, such as the plaintiffs here, desires to build a wharf or to exercise littoral rights, past intrusive usage for many years by the adjacent upland owner should not interfere with that right.[8] Nor should the location of bulkheads change the littoral boundary line, just as the seawalls that were constructed in *Huguenot Yacht Club* did not change the littoral boundary.

In *West Michigan Dock & Market Corp.* v. *Lakeland Investments*, 210 Mich. App. 505, 534 N.W.2d 212 (1995), the Michigan Court of Appeals affirmed the trial court's rejection of the defendant's claim that it had acquired rights in an adjoining boat slip by acquiescence. The defendant and its predecessors had used the disputed boat slip on Lake Muskegon to dock vessels for approximately sixty years before a controversy erupted. The court stated that the evidence showed "that both the plaintiff and the defendant understood that the boat slip was on plaintiff's property and that defendant and its predecessor in interest used the slip with plaintiff's permission until 1989. Defendant's use with plaintiff's permission of property that was acknowledged to belong to plaintiff could not, as a matter of law, entitle defendant to acquire property rights in the west forty feet of the slip by either adverse possession, prescriptive easement, or *acquiescence.*" (Emphasis added.) Id.,

---

[8] We note that the defendant claims that the trial court's statement that there was no dispute regarding the upland boundary was clearly erroneous. We read that statement in context to mean simply that the parties were not at issue as to the approximate twenty-five foot boundary line that was on dry land. The dispute was over the claimed extension of the upland boundary by the driving of the piles in front of the plaintiffs' property.

512. The Court of Appeals also affirmed the trial court's order that the defendant pay $5000 to the plaintiff for the use of the slip or, in the alternative, remove any encroachment. This case is also instructive because it illustrates that long-standing permissive use does not necessarily give the user any littoral rights by acquiescence.

Neighboring landowners did object to a claimed encroachment on their littoral rights in *Freed* v. *Miami Beach Pier Corp.*, 93 Fla. 888, 112 So. 841 (1927), but the objection came too late. The court denied the neighbors' request for an order restraining the defendants from further work on the subject pier because large sums of money had already been expended on the erection of the pier and the neighbors were on sufficient notice of the proposed construction to have interposed a timely objection. Here, there was an immediate objection and the defendant introduced no evidence of the cost of constructing the encroaching piles and docks.

The defendant has not cited, nor have we found, any cases in which the doctrine of equitable acquiescence was applied in circumstances where a party immediately objected to an intrusion into the water in front of his property, yet permitted the intruding neighbor to use and develop the area for many years pursuant to a "license."[9] The fatal flaw in the defendant's reliance on *Lowndes* v. *Wickes*, supra, 69 Conn. 15, is the evidence that Robert DelBuono objected immediately and often to the defendant's intrusion and warned the defendant that there would be a day of reckoning eventually.

The defendant also claims that the trial court decision "inequitably deprives the defendant of approximately one-third of the docking facilities that have been used

[9] Robert DelBuono testified that he gave the defendant "license" to use the area.

in its business for over twenty years." The defendant cites *Waterstreet Associates Ltd. Partnership* v. *Innopak Plastics Corp.*, supra, 230 Conn. 776, for the proposition that it is improper for a court to fashion a littoral boundary line that "creates a distribution that is so inconsistent with past development and so inequitable that it denies the defendant its essential rights to wharf out and to obtain access to deep water." The trial court's decision did not violate that principle.

Our review of the record discloses evidence that the defendant never obtained the proper permits to configure the docks that the plaintiffs claim encroach on their littoral rights area. Furthermore, the defendant proceeded to develop docks, floats and pilings with total disregard of the likelihood that they might have to be removed. The defendant introduced no evidence of the number of slips affected, the cost of installing the encroaching docks and slips, the percentage of its slips affected or how much it would cost to remove them. Nor did the defendant introduce any evidence as to what percentage of its income was produced by slip fees from the docks in the contested area.

We also note that the trial court established a littoral boundary line giving each party rights over an area "proportionate to its shoreline." The plaintiffs introduced evidence that the boundary line claimed by the defendant would have given the defendant littoral rights over an area disproportionate to the extent of its shoreline property. "In apportioning [littoral] rights, the object to be kept in view is . . . to secure to each rights appropriate to, and over an area proportioned in extent to, his shore lines." (Internal quotation marks omitted.) Id. More importantly, the defendant was in no way prevented from building wharfs and obtaining access to deep water from docks in front of its own property. That access is the most important consider-

ation in setting littoral boundary lines. *Rochester* v. *Barney*, supra, 117 Conn. 469.

On the basis of the evidence that was adduced, the trial court did not act inequitably in drawing the littoral boundary line. The trial court reasonably could have concluded that any business hardship to the defendant was self-created. We conclude that the trial court's rejection of the defendant's equitable acquiescence claim was not clearly erroneous.

## III

## APPLICATION OF THE COVE METHOD

The defendant finally claims that the trial court, although it properly selected the cove method to determine the boundary line, improperly selected the shore points (headlands) that were used to define the mouth of the cove and improperly failed to run the perpendicular to the end of the row of piles that it claimed constituted the upland boundary line as extended by agreement or acquiescence of the parties. This claim is without merit.

The plaintiffs' expert witness testified that the chord of the applicable cove should be drawn between points at the Stratford Marina to the north and the Stratford town dock to the south. The defendant's expert testified that the chord of the cove should be drawn between a point at the northeast corner of the plaintiffs' property and the filled land area of the Stratford town dock. The defendant's chord would produce a smaller cove. The plaintiffs' expert testified that the littoral boundary line should be a perpendicular line from the chord that he defined to the point where the parties' common boundary met the mean high watermark. That littoral boundary would make the row of piles and several of the defendant's docks encroachments on the plaintiffs' littoral area. The defendant's expert testified that the

littoral boundary line should be a perpendicular line drawn from the chord that he used in defining the cove to the last of the line of five piles that angled to the north and were in front of the plaintiffs' property. This line would give the defendant littoral rights in all but a small portion of the disputed area.

Where expert testimony conflicts, it becomes "the function of the trier of fact to determine credibility and, in doing so, it could believe all, some or none of the testimony of either expert." (Internal quotation marks omitted.) *Koennicke* v. *Maiorano*, 43 Conn. App. 1, 14, 682 A.2d 1046 (1996); see also *State* v. *Medina*, 228 Conn. 281, 310, 636 A.2d 351 (1994). "The acceptance or rejection of the opinions of expert witnesses is a matter peculiarly within the province of the trier of fact and its determinations will be accorded great deference by [the reviewing] court." *F. P. Carabillo Construction Co.* v. *Covenant Ins. Co.*, 172 Conn. 564, 566, 375 A.2d 1029 (1977). Findings based on such expert testimony will be disturbed only if the trial court abused its discretion. See *Loewenberg* v. *Tiger Lee Construction Co.*, 1 Conn. App. 303, 308, 471 A.2d 665 (1984). With this standard in mind, we turn to the claims of the defendant.

The defendant asserts that the Stratford Marina should not have been used as the north headland because the chord defining the mouth of the cove would cross Ferry Creek, a navigable body of water that feeds into the Housatonic River. The use of such a headland, the defendant asserts, could impact on or cut off the littoral rights of property owners along Ferry Creek. The defendant offered no explanation as to how the division of littoral rights between the parties here with respect to their frontage on the Housatonic River could in any way affect the rights of property owners along Ferry Creek. Nor does the defendant cite any legal

authority that would support such a proposition.[10] The defendant also asserts that the headland at the Stratford Marina that was selected by the court was the remains of a wooden bulkhead. Such a bulkhead, the defendant claims, had neither the permanence nor the prominence to constitute a headland. The defendant also claims that the headland to the south, the Stratford town dock, was inappropriate because the dock is not a permanent structure.

The trial court credited the testimony of the plaintiffs' expert with respect to the shape of the cove and the terminus of the upland boundary between the properties. In addition, the trial court could well have considered that the defendant's expert was less credible than the plaintiffs' because of the defense expert's contradictory testimony in two earlier cases. Robert Reis, the defendant's expert, conceded that he had given contradictory testimony in two cases involving Stonington Harbor.[11] In one case, Reis opined that the relevant shoreline was straight. In the other case, he testified that the same relevant shoreline was concave, even though there had been no change in the shape of the shoreline in the interval between the cases.

As part of its last claim, the defendant asserts that the parties modified their upland boundary line to coincide with the line of piles that was driven by the defendant

[10] The north side of the plaintiffs' property abuts Ferry Creek. Thus, the plaintiffs would have littoral rights on that side of their property. See *Owen* v. *Hubbard*, 260 Md. 146, 158, 271 A.2d 672 (1970), where the Maryland Court of Appeals held that "any property bounding on navigable waters of this State, whether it be by the front, side, or back line, has riparian rights."

[11] The cases are *Harboredge Development Corp.* v. *Renehan*, Superior Court, judicial district of New London, Docket No. CV83-073363 (February 26, 1985), and *Water Street Associates Ltd. Partnership* v. *Innopak Plastics Corp.*, Superior Court, judicial district of New London, Docket No. CV89-05095063 (September 14, 1993). The contradictory testimony is discussed in *Water Street Associates Ltd. Partnership* v. *Innopak Plastics Corp.*, supra, 230 Conn. 771–72.

in the 1960s. The defendant contends that the last waterward pile is the end of the upland boundary line as modified by the agreement in 1960 or acquiesced in over the years. The defendant makes essentially the same arguments in support of this claim as were made in support of the claims discussed in parts I and II of this opinion. We conclude that the trial court properly rejected this claim of modification of the upland boundary line for the reasons previously discussed in parts I and II of this opinion. We further conclude that the trial court did not abuse its discretion or rely on erroneous findings of fact in selecting the terminus of the parties upland boundary line.

The judgment is affirmed.

In this opinion the other judges concurred.