DOROTHY WEAVER, COADMINISTRATOR (ESTATE OF DEMARIUS DOUGLAS WEAVER), ET AL.
*v.* CRAIG MCKNIGHT ET AL.
(AC 31969)

DiPentima, C. J., and Bear and Lavery, Js.

Argued October 13, 2011—officially released April 10, 2012

*D. Lincoln Woodard*, with whom, on the brief, was *Karolina A. Dowd*, for the appellants (plaintiffs).

*Thomas W. Boyce*, with whom was *Jennifer Antognini-O'Neill*, for the appellees (defendant Henry Amdur et al.).

*Opinion*

DiPENTIMA, C. J. The facts underlying this case involve one of life's most heartrending and painful

events, the stillbirth of an infant. After suffering this terrible loss, the plaintiffs, Dorothy Weaver and Fred Weaver, as coadministrators of the estate of Demarius Douglas Weaver (decedent), and Dorothy Weaver, individually, filed a medical malpractice action against the defendants Henry Amdur, a physician specializing in obstetrics and gynecology, and Thames Gynecologic Group, P.C.[1] The dispositive issue is whether the trial court properly precluded two of the plaintiffs' expert witnesses from testifying as to the cause of the stillbirth. We affirm the judgment of the trial court.[2]

The following facts and procedural history are relevant to the resolution of the plaintiffs' appeal. In 2006, Nancy C. Hess, an advanced practice registered nurse,[3] commenced employment with the Thames Gynecologic Group, P.C. At this time, she began treating Dorothy Weaver (Weaver), who was thirty-four weeks pregnant. Pursuant to the terms of her employment, Hess assumed responsibility for the primary management of patients classified as "uncomplicated . . . ." For those patients designated "high risk" or "obstetric complex," Hess was to consult and collaborate with an obstetric physician who was ultimately responsible for their care. Weaver's due date was May 21, 2006.

---

[1] In their complaint, the plaintiffs also named Craig McKnight, a physician specializing in obstetrics and gynecology, and Lawrence and Memorial Hospital as defendants. At the commencement of the trial, McKnight and Lawrence and Memorial Hospital no longer were defendants in the action.

[2] The plaintiffs also claim that the court improperly (1) precluded the testimony of Craig McKnight, a physician, by granting the defendants' motion in limine and motion for a protective order, (2) precluded the expert testimony of Nancy C. Hess, an advanced practice registered nurse, and (3) permitted the defendants to cross-examine Russell D. Jelsema regarding his professional censure. Because our conclusion that the court did not abuse its discretion in precluding the testimony from the plaintiffs' expert witnesses is dispositive of the present matter, we need not reach these issues.

[3] Hess testified that as an advanced practice registered nurse, she had one additional year of postgraduate education beyond that of a registered nurse. Her practice was devoted solely to obstetrics and gynecology.

On May 11, 2006, Hess saw Weaver for her weekly visit. Hess detected a fetal heart rate and fetal movement. Afterward, an ultrasound examination was performed, which allowed for several measurements of the fetus[4] to be taken. On Friday, May 12, 2006, Hess reviewed the results from the ultrasound and contacted Amdur. The measurements from the ultrasound indicated a large fetus, more than eleven pounds, plus or minus approximately two pounds. Hess conveyed this to Amdur, as well as that this was Weaver's fourth child, that she was thirty-five years old and that one of her previous babies was nine pounds, eight ounces at delivery. She also informed Amdur that Weaver had tested positive for sugar in her urine during her checkups on April 24, May 4 and May 11, 2006. Additionally, Hess told Amdur that measurements of the fetus were larger than expected for his gestational age. Amdur determined that the fetus was macrosomic[5] and stated that on Monday May, 15, 2006, Weaver should be offered a scheduled cesarean section to deliver the fetus. Amdur did not order any other tests.

After Hess conveyed Amdur's suggested plan to Weaver, she agreed to undergo a cesarean section. The procedure was scheduled on May 15, 2006, for the following day. On May 16, 2006, an admitting nurse and Craig McKnight, a physician specializing in obstetrics and gynecology, were unable to locate a fetal heart rate using an ultrasound examination. After confirming the result with a radiologist, McKnight informed Weaver that the fetus had died and that due to the size of the fetus, a cesarean section would be necessary to remove the fetus from Weaver.

---

[4] The term "fetus" is defined as "the product of conception, from the end of the eighth week to the moment of birth." T. Stedman, Medical Dictionary (27th Ed. 2000).

[5] During cross-examination, Hess stated that "macrosomic" is a medical term for a large baby.

On April 26, 2007, the plaintiffs commenced this action against the defendants. The operative complaint, dated January 12, 2010, contains six counts. The four counts pleaded on behalf of the decedent sound in wrongful death and loss of chance;[6] two other counts set forth a medical malpractice action on behalf of Weaver. The crux of the plaintiffs' complaint is that Amdur failed to care for Weaver's pregnancy given the macrosomic nature of the fetus, and, as a result, the pregnancy ended in the intrauterine demise of the fetus.

Prior to the start of the trial, the defendants filed a motion in limine to preclude the testimony of two of the plaintiffs' disclosed[7] expert witnesses, Frank J. Bottiglieri and Russell D. Jelsema, both of whom are physicians board certified in obstetrics and gynecology. Both witnesses were expected to opine that Weaver's uncontrolled gestational diabetes[8] was the cause of the stillbirth. The defendants argued that neither Bottiglieri nor

---

[6] "In a loss of chance case, a tortfeasor, through his [negligent failure to act], causes an individual to lose a chance to avoid some form of physical harm from a preexisting medical condition. . . . In such cases, the plaintiff must show that if proper treatment had been given, better results would have followed. . . . In recent years, a number of states have [adopted] some version of the loss of chance doctrine. . . . Generally speaking, courts have adopted three approaches in addressing this doctrine: (1) the relaxed causation approach, (2) the proportional approach, and (3) the traditional approach. . . . Connecticut recognizes a cause of action for lost chance . . . [and follows] a traditional approach in the determination of proximate cause." (Citations omitted; internal quotation marks omitted.) *Peterson* v. *Ocean Radiology Associates, P.C.*, 109 Conn. App. 275, 277–78, 951 A.2d 606 (2008); see also M. Taylor & D. Krisch, Encyclopedia of Connecticut Causes of Action (2009) p. 41.

[7] Practice Book (2006) § 13-4 (4) provides in relevant part: "In addition to and notwithstanding the provisions of subdivisions (1), (2) and (3) of this rule, any plaintiff expecting to call an expert witness at trial shall disclose the name of that expert, the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion, to all other parties within a reasonable time prior to trial. . . ."

[8] Gestational diabetes is defined as "carbohydrate intolerance of variable severity with onset or first recognition during pregnancy." T. Stedman, Medical Dictionary (27th Ed. 2000).

Jelsema possessed the requisite level of expertise to opine on the cause of death of the intrauterine fetus. After hearing testimony from the witnesses, the court precluded both of them from testifying as to the cause of death.

The defendants subsequently moved for a directed verdict. Specifically, they argued that the plaintiffs had failed to produce the requisite medical evidence that connected the alleged breach of the standard of care by Amdur to the death of the fetus. In granting the defendants' motion, the court determined that "[t]here [was] no evidence from which the jury could properly determine that there is a causal connection between the alleged deviation and the death of the fetus in utero." Thereafter, the court rendered judgment, and this appeal followed.

Before addressing the specifics of the plaintiffs' appeal, we set forth certain legal principles. The elements of a medical malpractice claim require the plaintiffs to prove by a preponderance of the evidence "(1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury. . . . Generally, the plaintiff must present expert testimony in support of a medical malpractice claim because the requirements for proper medical diagnosis and treatment are not within the common knowledge of laypersons." (Internal quotation marks omitted.) *Hayes* v. *Camel*, 283 Conn. 475, 484, 927 A.2d 880 (2007); see also *Cavallaro* v. *Hospital of Saint Raphael*, 92 Conn. App. 59, 74–75, 882 A.2d 1254, cert. denied, 276 Conn. 926, 888 A.2d 93 (2005); *Amsden* v. *Fischer*, 62 Conn. App. 323, 331, 771 A.2d 233 (2001) (expert testimony generally required to establish both standard of care and causation); M. Taylor & D. Krisch, Encyclopedia of Connecticut Causes of Action (2009) p. 41.

"All medical malpractice claims, whether involving acts or inactions of a defendant physician, require that a defendant physician's conduct proximately cause the plaintiff's injuries. The question is whether the conduct of the defendant was a substantial factor in causing the plaintiff's injury." *Poulin* v. *Yasner*, 64 Conn. App. 730, 738, 781 A.2d 422, cert. denied, 258 Conn. 911, 782 A.2d 1245 (2001); see also *Macchietto* v. *Keggi*, 103 Conn. App. 769, 775, 930 A.2d 817, cert. denied, 284 Conn. 934, 935 A.2d 151 (2007). "This causal connection must rest upon more than surmise or conjecture. . . . A trier is not concerned with possibilities but with reasonable probabilities. . . . The causal relation between an injury and its later physical effects may be established by the direct opinion of a physician, by his deduction by the process of eliminating causes other than the traumatic agency, or by his opinion based upon a hypothetical question." (Internal quotation marks omitted.) *Peatie* v. *Wal-Mart Stores, Inc.*, 112 Conn. App. 8, 21, 961 A.2d 1016 (2009); see also *Boone* v. *William W. Backus Hospital*, 272 Conn. 551, 571, 864 A.2d 1 (2005) (plaintiff required to establish that defendant's negligent conduct was cause in fact and proximate cause of decedent's injuries and death); *Grody* v. *Tulin*, 170 Conn. 443, 448, 365 A.2d 1076 (1976) (causal relation between defendant's wrongful conduct and plaintiff's injuries is fundamental element without which a plaintiff has no case); *Shegog* v. *Zabrecky*, 36 Conn. App. 737, 745, 654 A.2d 771 ("[n]o matter how negligent a party may have been, if his negligent act bears no relation to the injury, it is not actionable"), cert. denied, 232 Conn. 922, 656 A.2d 670 (1995).

We begin with a detailed recitation of the facts underlying the court's decision to prevent Bottiglieri and Jelsema from opining on the cause of death. Pursuant to Practice Book (2006) § 13-4 (4), the plaintiffs disclosed Hess and McKnight as expert witnesses. In an amended

disclosure dated June 24, 2008, the plaintiffs identified Bottiglieri and Jelsema as experts. The amended disclosure stated that both Bottiglieri and Jelsema were expected to testify as to the standard of care, Amdur's violations of the standard of care, the consequences of the violations and damages. The pleadings, medical records, deposition transcripts, autopsy results and subsequent tests constituted the bases for these opinions. Additionally, the opinions of both Bottiglieri and Jelsema were based upon their "knowledge, training, education and experience as . . . practicing physician[s] board certified in the fields of obstetrics and gynecology."[9]

Following the disclosure, the parties deposed Jelsema on September 3, 2008, and Bottiglieri on October 29, 2008. The defendants filed a motion in limine dated January 11, 2009, to preclude the expert testimony of Bottiglieri and Jelsema. In their memorandum of law, the defendants argued that neither Bottiglieri nor Jelsema were qualified to testify as to the cause of fetal death in this case.[10] At a motions hearing on January 27, 2010, the parties suggested that the court defer ruling on the defendants' motion in limine until the two physicians testified. The court agreed to follow the course suggested by counsel.[11]

On February 3, 2010, the plaintiffs called Jelsema as a witness. He testified that he practiced as "an obstetrician with [a] subspecialty in maternal fetal medicine, complicated pregnancies," in Michigan. After medical

[9] The disclosure noted that Jelsema was also board certified in maternal/fetal medicine.

[10] This court has recognized that a witness may be qualified to testify as an expert with respect to the standard of care, but not qualified to provide expert testimony with respect to causation. See, e.g., *Sherman* v. *Bristol Hospital, Inc.*, 79 Conn. App. 78, 84–85, 828 A.2d 1260 (2003).

[11] The court referenced our decision in *Richmond* v. *Longo*, 27 Conn. App. 30, 36–37, 604 A.2d 374, cert. denied, 222 Conn. 902, 606 A.2d 1328 (1992), as support for its decision to defer ruling on the motion.

school, he completed a four year residency in obstetrics and gynecology, and then completed a two year fellowship where he received additional training in the care of women with complicated pregnancies. He later testified that, in his opinion, to a reasonable degree of medical certainty, the standard of care required that Weaver should have been evaluated on May 12, 2006, because she had several risk factors for gestation diabetes.[12] Additionally, he stated that the health of the fetus needed to be evaluated.

Jelsema testified that he "[q]uite frequently" managed patients who have suffered a stillbirth. Additionally, he agreed with counsel that part of his routine care of these patients was to "try and look at everything to determine the cause of stillbirth . . . ." Autopsies are used in the majority of these cases to provide information as to the possible cause of death. Jelsema indicated that these autopsies are performed by pathologists. He further noted that gestational diabetes is associated with an increased risk of stillbirth, but he could not quantify the increased risk. Jelsema explained that the current medical understanding was that high blood sugar as a result of gestational diabetes leads to increased acid in the bloodstream, which then becomes progressive and can result in the death of the fetus.

The plaintiffs' counsel then asked Jelsema questions regarding the autopsy report. He testified that he would look for a large abdomen and organs in cases where stillbirth was caused by gestational diabetes and that the autopsy report indicated enlarged organs in this

---

[12] As explained by Jelsema, Weaver had the following risk factors for developing gestational diabetes: Advanced maternal age, being African-American, being overweight and having a prior child with a birth weight greater than nine pounds. Additionally, Jelsema noted that the fetus showed an increased fundal height, persistent sugar in Weaver's urine and that these facts further suggested a diagnosis of gestational diabetes.

case.[13] Counsel then asked Jelsema if he had an opinion, to a reasonable degree of medical certainty, as to whether gestational diabetes caused or contributed to the stillbirth. The defendants' counsel objected on the basis of an insufficient foundation, both as to Jelsema's expertise and the facts allowing him to make the causal connection.

Outside of the presence of the jury, the plaintiffs' counsel argued that the qualifications of Jelsema to testify as to the cause of death had been established. The defendants' counsel countered that (1) Jelsema was not a pathologist, (2) the pathologist who conducted the autopsy of the fetus found no cause of death and (3) there was no evidence to support Jelsema's opinions regarding increased acid in the bloodstream. Counsel for the plaintiffs responded that the arguments raised by the defendants' counsel went to the weight of Jelsema's opinion rather than its admissibility. The court then stated: "Here, the matter specifically in issue for this question is the cause of death. And the witness has testified that he's written a lot about diabetes. He's studied a lot about diabetes. He teaches about different things, but he's never—he hasn't testified that he has any experience at all in determining the cause of death."

After a recess, the court sustained the defendants' objection, but permitted the plaintiffs' counsel to make an offer of proof. Jelsema testified that after a stillbirth, he collects the available records and reviews them with the mother. He then testified that "[I] give an impression

---

[13] During his testimony, Jelsema discussed the autopsy report and noted that it concluded that there were no apparent birth defects or signs of infection, thereby eliminating other potential causes of death. "[D]ifferential diagnosis is a method of diagnosis that involves a determination of which of a variety of possible conditions is the probable cause of an individual's symptoms, often by a process of elimination." (Internal quotation marks omitted.) *Klein* v. *Norwalk Hospital*, 299 Conn. 241, 252, 9 A.3d 364 (2010).

of what I believe was the cause of their stillbirth." Counsel asked Jelsema the following question: "And approximately how many times have you, yourself, been involved in a case where there is evidence of gestational diabetes in a patient and where the pathology report comes back having findings where there is no anatomic cause of death?" Jelsema answered: "Approximately ten cases where I've had patients referred to me. These are not my personal patients but seen for consultation." He then explained that he was able to determine the cause of death, even though a pathologist could not, by "putting together the entire clinical information of her pregnancy, blood sugar evaluation, findings on the autopsy of a large baby, absence of other problems." Finally, he stated that in cases where death is caused by gestational diabetes, a pathology report frequently does not identify an anatomic cause of death. The court declined to revisit its earlier ruling, and the jury returned to the courtroom for the remainder of Jelsema's testimony.[14]

As we previously have indicated, our Supreme Court has instructed that expert testimony in most medical malpractice cases is essential. *Aspiazu* v. *Orgera*, 205 Conn. 623, 630–31, 535 A.2d 338 (1987); see also *Boone* v. *William W. Backus Hospital*, supra, 272 Conn. 567; C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 7.5.4 (b), pp. 411–12.[15] The reason for this requirement is that "[t]he medical effect upon the human system of the infliction of injuries, is generally not within the sphere of the common knowledge of a lay witness . . . ." (Internal quotation marks omitted.)

---

[14] The next day, the court granted the motion in limine to preclude the testimony of Bottiglieri and Jelsema with respect to the issue of the cause of the death of the fetus.

[15] That is not to say, however, that expert testimony is required in *all* medical malpractice cases. See, e.g., *Kalams* v. *Giacchetto*, 268 Conn. 244, 248 n.4, 842 A.2d 1100 (2004); *Esposito* v. *Schiff*, 38 Conn. App. 726, 730, 662 A.2d 1337 (1995).

*Aspiazu* v. *Orgera,* supra, 631. Nevertheless, expert testimony may be admitted into evidence by the trial court only if it first determines that the witness is qualified with respect to the particular matter at issue. *Sherman* v. *Bristol Hospital, Inc.,* 79 Conn. App. 78, 86, 828 A.2d 1260 (2003); see also *Sullivan* v. *Metro-North Commuter Railroad Co.,* 292 Conn. 150, 158, 971 A.2d 676 (2009).

We now identify our standard of review. "The decision to preclude a party from introducing expert testimony is within the discretion of the trial court. . . . On appeal, that decision is subject only to the test of abuse of discretion. . . . The salient inquiry is whether the court could have reasonably concluded as it did." (Citations omitted; internal quotation marks omitted.) *Amsden* v. *Fischer,* supra, 62 Conn. App. 325–26; see also *Sullivan* v. *Metro-North Commuter Railroad Co.,* supra, 292 Conn. 157 (trial court's wide discretion on rulings of admissibility of expert testimony will not be disturbed absent abuse of discretion or clear misconception of law).[16]

The test for the admission of expert testimony, as established by our Supreme Court, is as follows: "Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge

---

[16] We note that "[b]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful. . . . Moreover, an evidentiary impropriety in a civil case is harmless only if we have a fair assurance that it did not affect the jury's verdict. . . . A determination of harm requires us to evaluate the effect of the evidentiary impropriety in the context of the totality of the evidence adduced at trial." (Citation omitted; internal quotation marks omitted.) *Klein* v. *Norwalk Hospital,* supra, 299 Conn. 254–55. As a result of our conclusion that the court did not abuse its discretion in precluding testimony from Bottiglieri and Jelsema, we do not proceed to the question of harm.

is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . In other words, [i]n order to render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion." (Citations omitted; internal quotation marks omitted.) *Sullivan* v. *Metro-North Commuter Railroad Co.*, supra, 292 Conn. 158. The court further instructed that the true test of admissibility is "whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue. . . . Implicit in this standard is the requirement . . . that the expert's knowledge or experience must be directly applicable to the matter specifically in issue." (Citations omitted; internal quotation marks omitted.) Id., 158–59.

This court has noted that, in the context of a medical malpractice action, expert opinions "must rest upon more than surmise or conjecture." (Internal quotation marks omitted.) *Hammer* v. *Mount Sinai Hospital*, 25 Conn. App. 702, 718, 596 A.2d 1318, cert. denied, 220 Conn. 933, 599 A.2d 384 (1991). In making the determination of whether the expert opinion achieves the requisite standard, we are mindful that "[t]here are no precise facts that must be proved before [it] may be received in evidence. . . . Rather, it is largely a matter of judicial discretion as to whether a witness has been shown to have sufficient experience and opportunity of observation to render his [or her] opinion." (Citation omitted; internal quotation marks omitted.) Id.; see also C. Tait & E. Prescott, supra, § 7.6.1, p. 417. We also have noted that "[s]ome facts must be shown as the foundation for an expert's opinion, but there is no rule of law declaring the precise facts which must be proved before such an

opinion may be received in evidence." (Internal quotation marks omitted.) *Peatie* v. *Wal-Mart Stores, Inc.*, supra, 112 Conn. App. 20.

The specific issue before us is whether the court abused its discretion in determining that the plaintiffs had failed to establish Jelsema's qualifications to offer expert testimony regarding the cause of death of the fetus. The court concluded that the plaintiffs had failed to establish that Jelsema possessed the requisite knowledge and experience with respect to the specific issue of whether the gestational diabetes of Weaver was the cause or a substantial factor in causing the stillbirth. Our review is limited by the abuse of discretion standard and instruction from our Supreme Court that the trial court is afforded "wide discretion" and that its ruling may be disturbed only in cases where that discretion is abused or where there has been a clear misconception of the law. *Sullivan* v. *Metro-North Commuter Railroad Co.*, supra, 292 Conn. 157. Put another way, our inquiry is limited to whether the court's decision to preclude the testimony constituted an abuse of discretion or involved a misconception of the law. It is not for a reviewing court to substitute its judgment for that of the trial court.

While it is true that Jelsema is not a pathologist, we note that this fact alone does not preclude him from testifying as to cause of death.[17] Nevertheless, looking at the entirety of Jelsema's testimony, the trial court was not persuaded that the plaintiffs had established that Jelsema was qualified to offer an expert opinion as to the cause of death. In other words, the plaintiffs

---

[17] "Medical specialties overlap, and it is within a court's discretion to consider that fact in exercising its discretion to deem the witness qualified to testify. It is not the artificial classification of a witness by title that governs the admissibility of the testimony, but the scope of the witness's knowledge of the particular condition." *Marshall* v. *Hartford Hospital*, 65 Conn. App. 738, 758, 783 A.2d 1085, cert. denied, 258 Conn. 938, 786 A.2d 425 (2001).

failed to produce sufficient evidence supporting Jelsema's belief that gestational diabetes caused the death. "Nothing . . . requires a . . . court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." (Internal quotation marks omitted.) *Klein* v. *Norwalk Hospital*, 299 Conn. 241, 263, 9 A.3d 364 (2010).[18] Even with respect to the ten cases where Jelsema indicated that he had determined the cause of death when a pathologist could not, there was no evidence regarding the scientific validity of this opinion. Additionally, we note that Jelsema testified that in his practice, he "tr[ied]" to look at all the data to determine the cause of a stillbirth and would give his impressions as to what he "believe[d]" was the cause of death. As the trial court recognized, Jelsema's experience in treating pregnant women with gestational diabetes permitted him to offer expert testimony regarding that condition, but did not provide a basis for him to testify that gestational diabetes caused the death of the fetus. See *Klein* v. *Norwalk Hospital*, supra, 263. Moreover, this testimony failed to persuade the trial court that Jelsema had any peculiar knowledge or experience that rendered his opinion any aid to the fact finder in determining the question of whether gestational diabetes was the cause of death in this case. See *Sullivan* v. *Metro-North Railroad Co.*, supra, 292 Conn. 158–59. While Jelsema indisputably possessed certain knowledge regarding gestational diabetes, the plaintiffs failed to demonstrate a basis that his belief regarding the cause of death in this case constituted more than surmise or conjecture. See *Peatie* v. *Wal-Mart Stores, Inc.*, supra, 112 Conn. App. 21. We conclude, therefore, that the trial court did not abuse its discretion in precluding the testimony of Jelsema on the issue of the cause of death of the plaintiffs' son.

---

[18] In *Klein* v. *Norwalk Hospital*, supra, 299 Conn. 263, our Supreme Court noted the following definition of ipse dixit: "[A]n assertion made but not proved: dictum . . . ." (Internal quotation marks omitted.)

We now turn to the issue of whether the court abused its discretion in precluding the testimony of Bottiglieri. On February 4, 2010, the day after the court had precluded the plaintiffs from introducing the causation testimony of Jelsema into evidence, the parties agreed to have Bottiglieri testify outside the presence of the jury. Bottiglieri began by stating that he is a board certified obstetrician and gynecologist. His medical practice consists of both obstetrics and gynecology. Approximately 3 to 5 percent of the patients to whom he provides medical care have gestational diabetes. He indicated that gestational diabetes increases the risk of stillbirth and that the more severe the diabetes, the greater the risk.

Bottiglieri stated that the mechanism that leads to the stillbirth of a fetus with a mother who has gestational diabetes is not normally detectable in an autopsy. Bottiglieri then testified that he had been involved in approximately twelve stillbirths involving mothers with gestational diabetes, but was not sure if any involved a late term stillbirth. He also indicated that he would determine the cause of death where a pathologist could not, because he is able to "see things that a pathologist may not see on an autopsy." He then opined to a reasonable degree of medical certainty that Weaver suffered from gestational diabetes and that her condition was a substantial factor contributing to the death of the fetus.

After the testimony of Bottiglieri had concluded, the court heard argument from counsel. It then granted the defendants' motion to preclude because "the qualifications indicated by the examination do not rise to the level of meeting the hurdle as placed by the directly applicable language as it relates to time and cause of death."

Bottiglieri testified that he had treated only approximately twelve women with gestational diabetes who

suffered a stillbirth. Additionally, he did not believe that any of those circumstances involved a late term stillbirth, as occurred in the present case. Although he indicated that he could determine a cause of death even though a pathologist could not, the plaintiffs failed to produce any evidence indicating the validity of that medical opinion. As stated previously, a court is not required to admit into evidence an opinion connected to the data only by the ipse dixit of the expert. *Klein* v. *Norwalk Hospital,* supra, 299 Conn. 263. Put another way, the plaintiffs did not adduce the necessary facts that would provide the foundation to remove Bottiglieri's opinion from the realm of speculation. Applying our deferential standard of review, we conclude that the court did not abuse its discretion in precluding Bottiglieri's testimony regarding the cause of death of Weaver's fetus.

The judgment is affirmed.

In this opinion the other judges concurred.