## CYNTHIA SARGIS *v.* TERRENCE DONAHUE ET AL.
### (AC 32992)

Robinson, Bear and Sullivan, Js.

Argued December 4, 2012—officially released May 14, 2013

*Keith Yagaloff*, for the appellant (substitute plaintiff).

*S. Peter Sachner*, for the appellees (defendants).

*Opinion*

ROBINSON, J. In this medical malpractice action, the substitute plaintiff, Robert S. Sargis, Sr., executor for the estate of Cynthia Sargis (decedent),[1] appeals from the judgment of the trial court granting the motion for judgment notwithstanding the verdict filed by the defendants, Terrence Donahue, a physician, and New Britain Surgical Group, Inc. On appeal, the plaintiff claims that the court erred when it (1) applied an improper standard of proof for causation and (2) granted the defendants' motion.[2] We reverse the judgment of the trial court.

---

[1] Robert S. Sargis, Sr., was substituted as the plaintiff for the decedent, who had initiated this action, following her death during the pendency of the action. Her death is not alleged to be relevant to this case. We therefore refer in this opinion to Robert S. Sargis, Sr., as the plaintiff.

[2] In his statement of issues, the plaintiff set forth the following claims: (1) "[t]he trial court erred in setting aside the jury verdict in favor of the plaintiff," (2) "[t]he trial court erred in applying, postverdict, a causation standard of proof for a lost chance action instead of for traditional medical malpractice," (3) "[t]he court erred in disregarding the negligence standard of proof on which the jury was charged, and applying a different standard of proof on [the] defendant's motion [for judgment notwithstanding a verdict]," (4) "[t]he court deprived the plaintiff of a fair and impartial trial, by setting aside the jury's verdict and requiring evidence of causation that was not required by the standard on which the jury was charged," (5) "[t]he court deprived the plaintiff of a just and fair verdict," and (6) "[t]he trial court deprived the plaintiff of due process by requiring a new standard of proof of negligence after the jury verdict in favor of the plaintiff." Because issues two through six are subsumed in the broader question of whether the court applied an improper standard of proof for causation, we do not address them separately. See *Giannamore* v. *Shevchuk*, 108 Conn. App. 303, 305 n.1, 947 A.2d 1012 (2008).

The record reveals the following undisputed facts and procedural history. On September 23, 2002, Donahue performed laparoscopic repair of the decedent's umbilical and incisional hernia. The procedure involved the surgical implantation of a mesh on the decedent's abdominal wall. Following the surgery, the decedent developed complications. Five days after the surgery, on Saturday, September 28, 2002, she went to the New Britain General Hospital emergency room complaining of redness and bruising around the incision site, and potential bronchitis. At the emergency room, the decedent received an intravenous dose of an antibiotic and an oral antibiotic, Zithromax, in a five tablet dosing package called a Z-pak. The decedent was administered two tablets at the hospital during her emergency room visit, and thereafter she took one each day thereafter until the pack was finished, on the following Tuesday. The consultation report provided to Donahue's medical partner from the emergency room noted that there were signs of bruising but no inflammation around the incision site.

Two days after the emergency room visit, on Monday, September 30, 2002, Donahue examined the decedent at his office. He noted symptoms that indicated possible cellulitis on the skin over the area where the mesh had been implanted, but did not perform any microbiological testing, prescribe any additional antibiotics or treat the decedent's abdominal redness. Rather, he directed the decedent to finish the Z-pak that she had received at the emergency room.

Three weeks later, on October 21, 2002, Donahue again examined the decedent, diagnosed her with cellulitis and, for the first time, prescribed two antibiotics for her. Approximately five weeks after her surgery, however, on November 1, 2002, the decedent was admitted to the hospital for an exploratory laparotomy and surgical removal of the mesh located on the abdominal

wall, which was infected. Additionally, she was diagnosed with edema and cellulitis of the skin around the mesh, and treated with intravenous and oral antibiotics. The decedent was discharged from the hospital on November 3, 2002. At various times from November 3 to November 29, 2002, the decedent consulted with Donahue for treatment of her abdomen. Following the mesh removal surgery, she had a disfigurement of her abdomen, experienced great pain and required additional surgery. The decedent then brought this medical malpractice action against the defendants, alleging that they failed to observe, evaluate and treat her postoperative infection timely and adequately.

During the trial, the defendants moved for a directed verdict at the conclusion of the plaintiff's case-in-chief and again after the defendants rested their case, but prior to closing argument. The court reserved decision each time. At the conclusion of the five day trial, the jury rendered a general verdict in favor of the plaintiff in the amount of $149,334, which the court accepted. The defendants subsequently filed a motion for judgment notwithstanding the verdict. Consistent with their position when they had moved for a directed verdict after the plaintiff's case-in-chief and after they had rested their case, the defendants maintained that the plaintiff had failed to offer, by way of requisite expert testimony, sufficient evidence regarding proximate cause for the decedent's injuries. They asserted that the plaintiff's relevant expert witness, Gabor Kovacs, a doctor board certified in general surgery, never testified with a reasonable degree of medical probability that Donahue's breach of the standard of care was a substantial factor in causing the decedent's injuries. The plaintiff filed an objection and the matter was heard on November 17, 2009. After oral argument, the court ordered the parties to submit supplemental briefing on the issue of what evidence is required for causation in

a medical malpractice action where the negligence of the physician is based on omissions rather than commissions of acts. Both parties submitted supplemental memoranda of law.

The court issued its memorandum of decision, granting the defendants' motion, and rendered judgment in favor of the defendants. The court's memorandum of decision began by setting forth the standard of proof for ordinary medical malpractice and the standard of proof for causation of an ordinary medical malpractice action. It then went on to note: "Connecticut recognizes a cause of action for lost chance, and the cases provide a helpful analytic framework for the claims in this case—that, as a result of the defendants' failure to diagnose and treat a postoperative infection, the infection was not eradicated and it spread, thereby causing injury to the plaintiff's decedent. The plaintiff and the defendants have employed such cases in presenting their arguments." The court continued, quoting the standard of proof for lost chance actions as well as the legal standard for causation for a lost chance cause of action. After citing case law for the proposition that the opinions expressed by an expert must be more than speculation or conjecture, the court made its factual findings and legal conclusions. It found in relevant part that, "[h]aving reviewed the entire record . . . the plaintiff has failed to sustain his burden to prove by way of expert testimony that the defendants' actions, or in this case inactions, were a proximate cause of the decedent's injuries as a result of a loss of opportunity for successful treatment. Rather . . . Kovacs' testimony, while informative as to what should have been done by . . . Donahue and why, failed to show that if what should have been done had been done it probably would have affected the outcome for [the decedent] in this case. Based on the record before the court, the evidence presented is insufficient to remove from the realm of

speculation the issues of whether the breach of the standard of care was the proximate cause of her injuries." After the court denied the plaintiff's motion to reconsider/reargue, this appeal followed.

The plaintiff filed a motion for articulation, which was denied by the court, but after this court granted the plaintiff's motion for review, we ordered the court to "articulate whether in ruling on the [defendants'] motion for judgment [notwithstanding] the verdict it applied a lost chance standard or a traditional malpractice standard when deciding whether the plaintiff met his burden of proof of establishing proximate cause, and, if the court applied a lost chance standard, then the court is further ordered to address the five requests for articulation . . . contained in the plaintiff's December 27, 2010 motion for articulation." The court articulated its decision, stating: "The court applied a traditional malpractice standard when deciding whether the plaintiff had met his burden of proof of establishing probable cause."

On appeal, the plaintiff claims that court improperly granted the defendants' motion for judgment notwithstanding the verdict. We agree.

We begin with our standard of review. "The standard of review governing a motion for judgment notwithstanding the verdict is the same [as that for a directed verdict] because a motion for judgment notwithstanding the verdict is not a new motion, but the renewal of a motion for a directed verdict." (Internal quotation marks omitted.) *Gagne* v. *Vaccaro*, 255 Conn. 390, 400, 766 A.2d 416 (2001). "[O]ur review of a trial court's [decision] to direct a verdict or to render a judgment notwithstanding the verdict takes place within carefully defined parameters. [In determining whether the trial court has correctly set aside the verdict, we] must consider the evidence, including reasonable inferences

which may be drawn therefrom, in the light most favorable to the parties who were successful at trial . . . . [We will uphold a trial court's decision to set aside the verdict and direct judgment] only if we find that the jury could not reasonably and legally have reached [its] conclusion." (Internal quotation marks omitted.) *Harris* v. *Bradley Memorial Hospital & Health Center, Inc.*, 296 Conn. 315, 336–37, 994 A.2d 153 (2010). "While it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven . . . it may not resort to mere conjecture and speculation." (Citation omitted.) *Gagne* v. *Vaccaro,* supra, 400. "Thus, a trial court may set aside a verdict on a finding that the verdict is manifestly unjust because the jury, on the basis of the evidence presented, mistakenly applied a legal principle or because there is no evidence to which the legal principles of the case can be applied." *Suarez* v. *Sordo,* 43 Conn. App. 756, 759, 685 A.2d 1144 (1996), cert. denied, 240 Conn. 906, 688 A.2d 334 (1997).

The plaintiff claims that in reaching its decision to set aside the jury's verdict, the court used an improper standard of proof and that its articulation is inapposite to the original basis that the court set forth in its memorandum of decision granting the defendants' motion. He argues that given the fact that the complaint is devoid of lost chance allegations, that the jury was charged on the ordinary standard of causation for medical malpractice actions and that there was no discussion or consideration of lost chance before the verdict, the court incorrectly reviewed, analyzed and applied the lost chance doctrine in this case. Additionally, the plaintiff maintains that there was evidence to support the jury's implicit finding of proximate cause, and, accordingly, the court improperly granted the defendants' motion. The defendants argue that the court used the traditional medical malpractice standard and that it correctly concluded that the plaintiff had failed to satisfy his burden

of proof with regard to proximate cause. Even assuming, without deciding, that the court used the appropriate standard of proof, we nevertheless conclude that there was sufficient evidence of causation and, accordingly, that the court improperly granted the defendants' motion.[3]

"[T]o prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury. . . . Generally, the plaintiff must present expert testimony in support of a medical malpractice claim because the requirements for proper medical diagnosis and treatment are not within the common knowledge of laypersons." (Internal quotation marks omitted.) *Macchietto* v. *Keggi*, 103 Conn. App.

---

[3] Although, for the purposes of this appeal, we need not decide whether the court used the proper standard of proof in this case, we note that the use of the lost chance doctrine for deciding an ordinary medical malpractice action would not be appropriate. The general standard of causation in ordinary medical malpractice claims contemplates omissions as well as commissions of negligent acts. "All medical malpractice claims, *whether involving acts or inactions of a defendant physician,* require that a defendant physician's conduct proximately cause the plaintiff's injuries." (Emphasis added; internal quotation marks omitted.) *Weaver* v. *McKnight*, 134 Conn. App. 652, 658, 40 A.3d 786, cert. granted on other grounds, 305 Conn. 907, 44 A.3d 183 (2012). To prove proximate cause under the lost chance doctrine, a specialized subset of ordinary medical malpractice dealing with a particular kind of omission that both parties agree does not apply in this case, the plaintiff must prove, in essence, that "what was done . . . probably would have affected the outcome." (Internal quotation marks omitted.) *Borkowski* v. *Sacheti*, 43 Conn. App. 294, 310, 682 A.2d 1095, cert. denied, 239 Conn. 945, 686 A.2d 120 (1996); see also *LaBieniec* v. *Baker*, 11 Conn. App. 199, 207, 526 A.2d 1341 (1987) ("[t]o prevail on [a lost chance] claim, a plaintiff must show (1) that he has in fact been deprived of a chance for successful treatment and (2) that the decreased chance for successful treatment more likely than not resulted from the defendant's negligence" [emphasis omitted; internal quotation marks omitted]). Proximate cause determinations under ordinary medical malpractice actions, however, do not focus on the outcome. Rather, a plaintiff need only prove that "the conduct of the defendant was a substantial factor in causing the plaintiff's injury." (Internal quotation marks omitted.) *Weaver* v. *McKnight*, supra, 658.

769, 774–75, 930 A.2d 817, cert. denied, 284 Conn. 934, 935 A.2d 151 (2007).

"All medical malpractice claims, whether involving acts or inactions of a defendant physician, require that a defendant physician's conduct proximately cause the plaintiff's injuries. The question is whether the conduct of the defendant was a substantial factor in causing the plaintiff's injury. . . . This causal connection must rest upon more than surmise or conjecture. . . . A trier is not concerned with possibilities but with reasonable probabilities. . . . The causal relation between an injury and its later physical effects may be established by the direct opinion of a physician, by his deduction by the process of eliminating causes other than the traumatic agency, or by his opinion based upon a hypothetical question." (Citations omitted; internal quotation marks omitted.) *Weaver* v. *McKnight*, 134 Conn. App. 652, 658, 40 A.3d 786, cert. granted on other grounds, 305 Conn. 907, 44 A.3d 183 (2012).

"To be reasonably probable, a conclusion must be more likely than not. . . . Whether an expert's testimony is expressed in terms of a reasonable probability that an event has occurred does not depend upon the semantics of the expert or his use of any particular term or phrase, but rather, is determined by looking at the entire substance of the expert's testimony." (Internal quotation marks omitted.) *Macchietto* v. *Keggi*, supra, 103 Conn. App. 776. "An expert . . . need not use talismanic words to show reasonable probability." (Internal quotation marks omitted.) *Milliun* v. *New Milford Hospital*, 129 Conn. App. 81, 100, 20 A.3d 36, cert. granted on other grounds, 302 Conn. 920, 28 A.3d 338 (2011).

The plaintiff's expert witness, Kovacs, first testified about the antibiotics that the decedent had received in the emergency room. He noted that the antibiotics given

to the decedent in the emergency room were more appropriate to treat a potential upper respiratory infection. Kovacs further stated that the standard of care when treating a patient when the surgeon recognizes signs of cellulitis is "to initiate aggressive antibiotic treatment in the face of cellulitis especially when there's a mesh involved and that standard would cover either starting . . . with aggressive oral antibiotics or . . . putting the patient in the hospital for intravenous antibiotics." Moreover, Kovacs testified, the standard of care in the decedent's situation would be to "make sure that the patient [at] least continues with a regimen of oral antibiotics or possibly admit the patient to the hospital for intravenous antibiotics to prevent any further spread of that infection and to closely follow that patient up to make sure that there's improvement or [no] worsening of the situation."

With regard to causation of the decedent's injuries, Kovacs testified that the goal of treating a patient with antibiotics upon the presentation of cellulitis is to eradicate the infection and that the failure to treat the cellulitis would result in a worse infection and an invasion of the infection to the deeper tissues of the abdominal wall with the possibility of infecting the mesh. Kovacs testified that once a surgical mesh becomes infected, in most cases it would have to be removed due to the presence of the infection. He further testified that Donahue had noted that the decedent had an infected mesh and that "most likely the infection started superficially over at the skin level and then with time it got deeper and invaded the deeper layers of the abdominal wall." Kovacs disagreed with Donahue's contention that if the infection had began as cellulitis, by the time the mesh had become infected, the skin would have become necrotic and would have been sloughing. Rather, Kovacs testified, there were some instances "where you

could possibly develop a necrosis of the skin secondary to the infection, but that's not usually the case."

Kovacs further testified that the decedent's cellulitis "most likely started about five to seven days after the operation and then it gradually got worse by invading the deeper tissues and the next evidence that we have that [it] really got down to the level of the fascia and the mesh is when the [decedent] had the [computerized axial tomography] scan on October 23 at which point the infection has spread to the deeper layers." After noting that the first surgery was performed to correct an umbilical and incisional hernia, Kovacs opined that the recurrence rate is higher than 50 percent. He further opined that with the combination of an additional incision as a result of the surgery to remove the mesh, the repair of the incision from the first surgery that placed the mesh and the fact that the decedent's tissues were infected during the mesh removal surgery, "most likely the [recurrence] rate would be somewhat higher than even the 50 percent rate because you're dealing with inflamed infective tissues which are usually weaker than a standard healthy tissue." Kovacs concluded his testimony by agreeing that all of his opinions were stated with a reasonable degree of medical certainty.

It is undisputed that Donahue did not prescribe any antibiotics to treat the decedent's cellulitis until three weeks after he had identified the possibility of cellulitis; instead he directed her to continue with an antibiotic that was more properly suited to treat an upper respiratory infection and that would be completed by the day after his initial postoperative examination. Kovacs testified that "[b]ased upon a reasonable degree of medical certainty . . . the standard of medical care was breached because there was a failure to fully appreciate the patient's condition in the sense that she was developing an infection and [to] take the appropriate steps to eradicate the infection." Moreover, Kovacs testified

that the purpose of the antibiotics is to eradicate the cellulitis infection, that the failure to treat the cellulitis infection can cause the mesh to become infected, that an infected mesh would need to be removed, that Donahue did not treat the decedent's cellulitis for approximately three weeks and that the decedent's untreated cellulitis caused the infected mesh. "[I]t [is] the jury's task to determine the credibility of the witnesses, including experts, and to weigh the evidence." *Medes* v. *Geico Corp.*, 97 Conn. App. 630, 639, 905 A.2d 1249, cert. denied, 280 Conn. 940, 912 A.2d 476 (2006). We conclude, on the basis of Kovacs' testimony, that the jury reasonably could have found that the plaintiff had met his burden of proof that the defendants had proximately caused the decedent's injuries by failing to diagnose and to treat her postoperative infection in a timely and adequate manner.

The judgment is reversed and the case is remanded with direction to reinstate the jury's verdict and to render judgment in favor of the plaintiff.

In this opinion the other judges concurred.