******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JOSE ARROYO ET AL. *v.* UNIVERSITY
OF CONNECTICUT HEALTH
CENTER ET AL.
(AC 38701)

Alvord, Prescott and Pellegrino, Js.

*Syllabus*

The plaintiffs sought to recover damages from the defendant health center and the defendant state of Connecticut for medical malpractice for injuries sustained by the plaintiff A during a vasectomy. The plaintiffs claimed that the urologist employed by the defendants who performed the surgery, P, negligently injured A's testicular artery, resulting in the removal of one of his testicles. Following a trial to the court, the trial court rendered judgment for the plaintiffs and the defendants appealed to this court. Prior to bringing this action, the plaintiffs filed a notice of claim with the Claims Commissioner pursuant to statute (§ 4-147), which was accompanied by a certificate of good faith, as required by statute (§ 4-160 [b]) in medical malpractice actions against the state, and the commissioner subsequently granted the plaintiffs permission to bring an action against the defendants. *Held*:

1. The defendants could not prevail on their claim that because the trial court rendered judgment for the plaintiffs on a theory of liability materially different from that which was alleged in their notice of claim, and for which they had received a waiver of sovereign immunity from the commissioner, the court was barred, under the doctrine of sovereign immunity, from rendering judgment for the plaintiffs on that theory of liability: given that the plaintiffs properly filed a timely notice with the commissioner seeking permission to pursue a medical malpractice action against the defendants and attached a good faith certificate to the notice, the commissioner, pursuant to § 4-160 (b), was required to grant the plaintiffs permission to bring their action, regardless of how precisely the plaintiffs worded the basis of their medical malpractice claim in their notice, and the fact that the notice of claim included more details, which were not in conflict with the theory pursued at trial, was not fatal to the plaintiffs' case; moreover, § 4-147 (2) expressly provides that the claim in the notice need not be particularized and requires only that the notice contain a concise statement of the basis of the claim, and the defendants failed to demonstrate that the basis of the claim in the notice filed with the commissioner was materially different from the basis of the plaintiffs' claim at trial.

2. This court declined to review the defendants' claim, raised for the first time on appeal, that the trial court improperly awarded damages to the plaintiffs on a theory of liability that was pursued at trial but was not alleged in their complaint, the defendants having waived their objection to any variance between the pleadings and the evidence by failing to object accordingly at trial.

3. The defendants' claim that the plaintiffs presented insufficient evidence on the issue of causation was unavailing; the testimony of the plaintiffs' expert, B, on causation relied on substantial evidence that was largely unchallenged by the defendants, B supported his opinion on causation through a method of diagnosis that involved a determination of which of a variety of possible conditions is the probable cause of an individual's symptoms, often by a process of elimination, and established the causal relation between A's injury and its later physical effects, and the court, as the trier of fact, was free to credit B's explanation for the cause of A's injury over that of the defendants' expert, and properly determined that the plaintiffs had satisfied their burden of proving that P injured A's testicular artery during the vasectomy and caused necrosis of A's testicle.

Argued May 16—officially released August 15, 2017

*Procedural History*

Action to recover damages for, inter alia, the defendants' medical malpractice, and for other relief, brought

to the Superior Court in the judicial district of Hartford and tried to the court, *Scholl, J.*; judgment for the plaintiffs; thereafter, the court granted the defendants' motion for a collateral source reduction, and the defendants appealed to this court. *Affirmed.*

*Michael G. Rigg*, for the appellants (defendants).

*Michael J. Walsh*, for the appellees (plaintiffs).

*Opinion*

PRESCOTT, J. In this action seeking damages for medical malpractice relating to a vasectomy, the defendants, the University of Connecticut Health Center (health center) and the state of Connecticut, appeal, following a bench trial, from the judgment of the trial court rendered in favor of the plaintiffs, Jose Arroyo and Marie Arroyo,[1] in the amount of $386,249.81.[2] The defendants claim that the court improperly (1) rendered judgment on a cause of action for which the plaintiffs had not obtained a waiver of sovereign immunity from the state's Claims Commissioner (commissioner),[3] (2) awarded damages on a theory of liability that was not alleged in the plaintiffs' Superior Court complaint, and (3) concluded that the plaintiffs had satisfied their burden of proving that the defendants' employee, Peter Albertsen, a urologist, had negligently injured Arroyo's testicular artery. We disagree with the defendants' claims and, accordingly, affirm the judgment of the trial court.

The following facts, as found by the court, and procedural history are relevant to our resolution of the defendants' claims. On April 1, 2013, Arroyo underwent a vasectomy performed by Dr. Albertsen at the health center. Immediately after the procedure, Arroyo suffered pain that continued, unabated, for several days. Subsequently, on April 4, 2013, he went to the emergency room at Saint Francis Hospital and Medical Center (hospital), where it was discovered that his left testicle was necrotic[4] because of a lack of blood flow through the testicular artery. This required Arroyo to undergo an orchiectomy, or surgical removal of the testicle, that same day. The surgery was performed by Dr. Marlene A. Murphy-Setzko, a urologist at the hospital. This procedure resulted in discomfort and pain for Arroyo from protruding sutures and infection, which, in turn, required him to undergo further treatments over a period of five months.

Sovereign immunity generally prevents a litigant from suing the state for money damages without its consent. See *Morneau* v. *State*, 150 Conn. App. 237, 246, 90 A.3d 1003, cert. denied, 312 Conn. 926, 95 A.3d 522 (2014). Thus, in order to obtain permission to sue the defendants for money damages, the plaintiffs filed a notice of claim on September 13, 2013, with the commissioner pursuant to General Statutes § 4-147.[5] The notice was accompanied by a certificate of good faith, as required in medical malpractice claims brought against the state pursuant to General Statutes § 4-160 (b),[6] which provides in relevant part: "In any claim alleging malpractice against the state, a state hospital or against a physician, surgeon . . . or other licensed health care provider employed by the state, the attorney or party filing the claim may submit a certificate of good faith to the Claims Commissioner in accordance with section 52-

190a. If such a certificate is submitted, the Claims Commissioner shall authorize suit against the state on such claim.''

In their notice of claim filed with the commissioner, the plaintiffs alleged that ''[d]uring the procedure Dr. Albertsen failed to identify, dissect and ligate the vas deferens, but instead he incorrectly dissected and ligated surrounding vascular structures thereby depriving, restricting and severing blood flow to [Arroyo's] left testicle.'' In an order dated November 6, 2013, the commissioner granted the plaintiffs permission to sue the defendants.

Subsequently, the plaintiffs commenced the present action against the defendants in Superior Court on January 29, 2014. The complaint, which was accompanied by a certificate of good faith as required by General Statutes § 52-190a,[7] contained two counts, the first sounding in medical malpractice on behalf of Arroyo and the second sounding in loss of consortium on behalf of Marie.

Count one mirrored the language used in the notice of claim filed with the commissioner, alleging that ''Dr. Albertsen failed to identify, dissect and ligate the vas deferens, but instead he incorrectly dissected and ligated surrounding vascular structures, thereby depriving, restricting and severing blood flow to the plaintiff's left testicle.'' It also alleged that Dr. Albertsen was negligent in one or more of six ways, those being that he failed ''[1] to properly identify the anatomy of the testicle, both before and during the procedure, by all means available to him, including palpation and visualization, to ensure that he adequately identified the spermatic cord and the vas deferens prior to his attempt to dissect the vas deferens . . . [2] to properly isolate and free the vas deferens from the surrounding anatomical structures prior to attempts to dissect the vas deferens . . . [3] to properly confirm that he had, in fact, identified the vas deferens by all means available to him, including palpation and visualization, before his attempts to dissect the vas deferens . . . [4] to dissect and ligate the vas deferens, and instead he incorrectly dissected and ligated surrounding blood vessels and vascular structures, thereby depriving, restricting and severing blood flow to the left testicle . . . [5] to timely and properly realize that he had, in fact, failed to dissect the vas deferens, but instead had dissected vascular structures in the testicle, and proceeded to conclude the procedure and discharge the patient from the facility; and . . . [6] to properly respond to and investigate the patient's repeated complaints of unusual and inordinate pain, both during and following the procedure in question, which investigation in all likelihood would have led him to the realization that he had failed to sever and dissect the appropriate vas deferens and instead severed and dissected vascular structures necessary for the contin-

ued viability of the left testicle."

The case progressed to pretrial discovery. During this time, the plaintiffs disclosed Dr. Michael Brodherson as their expert witness, and the defendants disclosed Dr. Wayne Glazier as their expert witness. The parties deposed both experts prior to trial.

Thereafter, on November 4, 2015, the trial commenced. The court heard testimony from several witnesses, including Dr. Albertsen, Dr. Brodherson, and Dr. Glazier. The evidence showed that during Arroyo's vasectomy, Dr. Albertsen failed to properly identify, dissect, and ligate the vas deferens in the left testicle and, instead, dissected and ligated a section of "vascular structures." There was no disagreement that the blood flow to the left testicle had been obstructed at the time that Arroyo was seen by Dr. Murphy-Setzko at the hospital on April 4, 2013, and that the loss of blood flow caused the necrosis of Arroyo's testicle. Rather, the parties disputed the cause of the injury. The plaintiffs argued that the injury to the testicular artery occurred during the vasectomy on April 1, 2013, and the defendants argued that testicular torsion[8] caused the loss of blood flow, meaning that the injury occurred sometime after the vasectomy, between April 1 and 4, 2013.

In a short memorandum of decision dated November 19, 2015, the court rendered judgment in favor of the plaintiffs. Specifically, the court concluded that the plaintiffs had established by a fair preponderance of the evidence that Dr. Albertsen was negligent in his treatment of Arroyo in that he "deviated from the standard of care of a board certified urologist in not isolating the vas deferens and [thereby] injuring the testicular artery to the left testicle of [Arroyo] during his performance of a vasectomy . . . ." This appeal followed.[9] Additional facts and procedural history will be set forth as necessary.

I

The defendants claim for the first time on appeal[10] that the court improperly rendered judgment for the plaintiffs on a theory of liability materially different from that which was alleged in their notice of claim filed with the commissioner and, thus, from that which they had received a waiver of sovereign immunity. Specifically, the defendants argue that in alleging that Dr. Albertsen "dissected and ligated . . . vascular structures, thereby . . . severing blood flow to [Arroyo's] left testicle," the "vascular structure" to which the plaintiffs must have been referring in their notice of claim was the testicular artery because the only "vascular structure" that could have resulted in a lack of blood flow to the testicle was the testicular artery. The defendants then reason that because the plaintiffs' theory of liability presented at trial was that Dr. Albertsen dissected and ligated a *vein*, not the testicular artery,

and injured the nearby testicular artery in turn by unintentionally *cauterizing*[11] it, the plaintiffs did not obtain a waiver of sovereign immunity for the claim presented to the court.[12] We disagree.

"The principle that the state cannot be sued without its consent, or sovereign immunity, is well established under our case law." (Internal quotation marks omitted.) *Morneau* v. *State*, supra, 150 Conn. App. 246. Therefore, "[o]ur Supreme Court expressly has stated that a plaintiff seeking monetary damages against the state must first obtain authorization from the Claims Commissioner." Id., 248. Section 4-147 provides in relevant part: "Any person wishing to present a claim against the state shall file with the Office of the Claims Commissioner a notice of claim . . . containing the following information: (1) The name and address of the claimant; the name and address of his principal, if the claimant is acting in a representative capacity, and the name and address of his attorney, if the claimant is so represented; (2) *a concise statement of the basis of the claim*, including the date, time, place and circumstances of the act or event complained of; (3) a statement of the amount requested; and (4) a request for permission to sue the state, if such permission is sought. . . . Such notice shall be for informational purposes only and shall not be subject to any formal or technical requirements, except as may be necessary for clarity of presentation and facility of understanding." (Emphasis added.)

In most cases, "[t]he [commissioner] may deny or dismiss the claim, order immediate payment of a claim not exceeding [$7500], recommend to the General Assembly payment of a claim exceeding [$7500] or grant permission to sue the state." *Morneau* v. *State*, supra, 150 Conn. App. 248; see General Statutes (Rev. to 2013) § 4-158 (b). Notably, however, as previously discussed herein, § 4-160 (b), which codified No. 98-76 of the 1998 Public Acts (P.A. 98-76), provides in relevant part that "[i]n any claim alleging malpractice against the state, a state hospital or against a physician . . . or other licensed health care provider employed by the state, the attorney or party filing [a malpractice] claim may submit a certificate of good faith to the Office of the Claims Commissioner in accordance with section 52-190a," and "[i]f such a certificate is submitted, the [commissioner] *shall* authorize suit against the state on such claim." (Emphasis added.)

"Before § 4-160 (b) was enacted, medical malpractice claims were treated like other claims against the state under . . . the General Statutes. . . . [T]he effect of § 4-160 (b) was to deprive the . . . commissioner of his broad discretionary decision-making power to authorize suit against the state in cases where a claimant has brought a medical malpractice claim and filed a certificate of good faith. Instead, § 4-160 (b) *requires*

the . . . commissioner to authorize suit in all such cases. In other words, the effect of the statute was to convert a limited waiver of sovereign immunity to medical malpractice claims, subject to the discretion of the . . . commissioner, to a more expansive waiver subject only to the claimant's compliance with certain procedural requirements." (Citations omitted; emphasis altered; footnote omitted.) *D'Eramo* v. *Smith*, 273 Conn. 610, 622, 872 A.2d 408 (2005).

As a general matter, "[s]overeign immunity relates to a court's subject matter jurisdiction over a case, and therefore presents a question of law over which we exercise de novo review." (Internal quotation marks omitted.) *Morneau* v. *State*, supra, 150 Conn. App. 246.

In the present case, the defendants assert that because the theory of liability presented in the plaintiffs' notice of claim filed with the commissioner was different from the "cauterization theory" that the plaintiffs presented at trial, the court was barred by the doctrine of sovereign immunity from rendering judgment for the plaintiffs on this "new" theory. In doing so, the defendants principally rely on *Morneau* for support.

In *Morneau*, the plaintiff filed a notice of claim with the commissioner, seeking to sue the state, among other defendants, for claims grounded in the alleged improper conduct of state marshals. Id., 249. After the commissioner dismissed the claim as untimely, the plaintiff successfully obtained a reversal of that decision from the legislature, which passed a resolution allowing a waiver of sovereign immunity. Id., 249–50. Accordingly, the plaintiff commenced an action in the Superior Court. Id., 250. The trial court ultimately dismissed the case, however, on the ground that "there was nothing in the plaintiff's initial claim to the [commissioner] that would support the distinct legal elements for the causes of action" alleged in his Superior Court complaint. Id.

On appeal, this court agreed with the trial court that the legislature never waived sovereign immunity for the claims at hand because "the plaintiff first raised these particular legal theories in [his] complaint," and "our review of the materials before the [commissioner], and then the General Assembly, reveals no allegations that would support the elements of these distinct causes of action." Id., 251.

The defendants argue that the present case is analogous to the facts of *Morneau* in that the plaintiffs here did not obtain permission to sue for the cause of action presented to the Superior Court. We are unconvinced for several reasons.

First, *Morneau* involved an adjudication by the commissioner as to whether, in his or her *opinion*, a particular claim is "just and equitable" pursuant to § 4-160 (a).[13] Such an adjudication necessarily depends on the nature of the specific claim at hand and the facts that support

it. In contrast, the present case, being a medical malpractice action, is subject to § 4-160 (b), which, as previously discussed, strips the commissioner of his discretionary decision-making power to authorize suit for such claims against the state if a certificate of good faith in accordance with § 52-190a has been submitted. *D'Eramo* v. *Smith*, supra, 273 Conn. 622. That is to say, the commissioner is *obligated*, without engaging in any discovery or adjudicatory processes, to authorize suit in all such cases. Id.

Here, the plaintiffs properly filed a timely notice with the commissioner, sought permission from the commissioner to pursue a medical malpractice action against the defendants, and attached a certificate of good faith. By virtue of the way in which this state's system for obtaining a waiver of sovereign immunity functions, the commissioner was, therefore, required to grant the plaintiffs' motion for permission to sue under the circumstances, regardless of how the plaintiffs precisely worded the basis of their medical malpractice claim in their notice.

In fact, the plaintiffs theoretically could have alleged more generally in their notice of claim that "Dr. Albertsen negligently performed a vasectomy," and, as long as they submitted a good faith certificate, the commissioner would have been obligated to grant a waiver of sovereign immunity to sue. The fact that the plaintiffs' actual notice of claim here included *more* details, which, as discussed further herein, did not conflict with the theory pursued at trial, is not fatal to their case.

Furthermore, in our view, the defendants' reading of *Morneau* is overly broad. Specifically, the defendants point to language in *Morneau* that provides that the plaintiff "needed to include information that would clarify *the nature of* the waiver sought and ensure that the [commissioner] . . . would have an understanding of *the nature of* that waiver." (Emphasis added.) *Morneau* v. *State*, supra, 150 Conn. App. 252. In the present case, this concern about apprising the commissioner of "the nature of the waiver" has no applicability because of the mandatory obligation of the commissioner to grant the waiver in all medical malpractice actions that are accompanied by a good faith certificate.

Finally, putting aside any comparisons with *Morneau*, we simply do not agree with the defendants' argument that the basis of the claim contained in the notice filed with the commissioner is materially different from the basis of their claim at trial. As previously stated, the plaintiffs' notice of claim alleged that "Dr. Albertsen failed to identify, dissect and ligate the vas deferens, but instead he incorrectly dissected and ligated surrounding vascular structures thereby depriving, restricting and severing blood flow to [Arroyo's] left testicle."

At trial, the court admitted the pathology reports from

the health center and the hospital that showed that Dr. Albertsen definitively had dissected and ligated a "section of muscular structure consistent with sections of a medium size vein"/"[p]ortion of [b]enign [v]ascular [c]onnective [t]issue" instead of the vas deferens.[14] Therefore, that portion of the notice alleging that Dr. Albertsen incorrectly dissected and ligated "vascular structures" was, in fact, presented to the court. Moreover, the plaintiffs argued at trial that "[Dr. Albertsen] proceeded to cut around [the vascular] structures with blunt and sharp dissection and cauterization," and "[i]n so doing, he injured the testicular artery with the cautery," thereby cutting off the blood flow to the left testicle. In other words, they argued that Albertsen's act of mistakenly dissecting and ligating the vascular structures eventually resulted in the loss of blood flow to Arroyo's left testicle, as they also alleged in the notice. Accordingly, the plaintiffs' theory of liability in their notice accurately sums up the theory of liability presented at trial, albeit in a truncated manner that omits any express mention of cauterization in the causal chain.

Admittedly, the basis of the claim in the notice to the commissioner was not as particularized as it might have been, but this fact is unsurprising because the plaintiffs did not have the benefit of months of discovery prior to drafting it. In other words, because discovery had not yet been allowed, the plaintiffs were essentially hamstrung at the outset with how detailed they could be in setting forth their medical malpractice claim. Cf. *Briere* v. *Greater Hartford Orthopedic Group, P.C.*, 158 Conn. App. 66, 83, 118 A.3d 596 (2015) ("Medical malpractice actions present a conundrum in that there is typically unequal access to the underlying facts and conditions of the claim at the time a complaint is served. . . . [W]e conclude that a better reading of the pleadings is a broad but pragmatic one that promotes substantial justice . . . ." [Citation omitted.]), aff'd, 325 Conn. 198, 157 A.3d 70 (2017). Moreover, § 4-147 (2) expressly provides that the claim in the notice need not be particularized, as all that is statutorily required is "a concise statement of the basis of the claim"; (internal quotation marks omitted) *Morneau* v. *State*, supra, 150 Conn. App. 249 n.16; as opposed to "a formal declaration of the particular causes of action [the claimants seek] to bring against the state . . . ." Id., 252. The permissive language of § 4-147—"[s]uch notice shall be for informational purposes only and shall not be subject to any formal or technical requirements"—appears to acknowledge that attaching any binding significance to this document at such an early stage of the proceeding would be unfair to a potential plaintiff. Therefore, we decline to do so in the present case.

For the foregoing reasons, we reject the defendants' assertion that the court improperly rendered judgment for the plaintiffs on a claim for which the commissioner

had not granted a waiver of sovereign immunity.

## II

We next address the defendants' claim, raised for the first time on appeal, that the court improperly awarded damages to the plaintiffs on a theory of liability that was pursued at trial, but was not alleged in their Superior Court complaint. Because the defendants waived their objection to any variance between the pleadings and the evidence by failing to object accordingly at trial, we decline to address this argument on its merits.

In determining whether a judgment against a defendant should be set aside because of defects in a plaintiff's pleading of his cause of action, our Supreme Court has stated that "[t]he proper way to attack a variance between pleadings and proof is by objection at the trial to the admissibility of that evidence which varies from the pleadings, and failure to do so at the trial constitutes a waiver of any objection to such variance. . . . A variance is a departure of the proof from the facts as alleged. . . . Only material variances, those which disclose a departure from the allegations in some matter essential to the charge or claim, warrant the reversal of a judgment. . . . Where a case has been litigated wholly upon the merits a party is not permitted after judgment to take advantage of defects in procedure which, had attention been called to them at the trial, could readily have been amended." (Citations omitted; internal quotation marks omitted.) *Tedesco* v. *Stamford*, 215 Conn. 450, 461–62, 576 A.2d 1273 (1990).

In the present case, the defendants never objected during trial to the introduction of testimony elicited from Dr. Brodherson that the injury to Arroyo's left testicle was due to the cauterization of the testicular artery, on the ground that it was not properly pleaded in the complaint. If the defendants had believed that there was a material variance between the pleadings and the evidence introduced at trial and had raised the issue at that time, "the plaintiff[s] might have been permitted to amend [their] complaint and any prejudice could have been cured by a request for a continuance." Id., 462. Because they never raised such an objection, however, any variance between the pleadings and proof at trial was clearly waived, and we, therefore, decline to address the merits of this argument.

## III

The defendants next claim that the court improperly concluded that the plaintiffs satisfied their burden of proving that Dr. Albertsen injured Arroyo's testicular artery. More specifically, they argue that the judgment should be reversed on the ground that the plaintiffs offered insufficient evidence on the issue of causation, being that the evidence they did offer of the cauterization theory was merely " 'surmise or conjecture' . . . ." We disagree.

The following additional facts and procedural history guide our resolution of this claim. As previously discussed, a substantial part of the evidence presented by both parties at trial came in the form of expert testimony from Dr. Brodherson, the plaintiffs' expert, and Dr. Glazier, the defendants' expert. Both experts testified on the issue of causation.

Dr. Brodherson began his testimony by explaining how a vasectomy is performed. In general, the surgery is designed to prevent the flow of sperm through the vas deferens, which is the duct that conveys the sperm, produced in the testis, from the epididymis to the urethra. First, the physician must locate and identify the vas deferens through the skin of the testicle by manual palpation. Once he or she has done so, the physician makes a small incision in the skin to access the structure. Before the physician can dissect and ligate[15] the vas deferens, however, he must isolate, or "strip," the vas deferens from all of the surrounding structures, such as the veins and the testicular artery.[16] This occasionally results in bleeding, which the physician controls through either cauterizing or tying the vas deferens. Once the vas deferens is successfully isolated, the physician then dissects, or cuts, the vas deferens in two places, while at the same time removing a small sample to send to pathology for testing to confirm that the correct anatomical structure was cut. Thereafter, the physician will ligate each of the cut ends of the vas deferens, that is, either "tie it, clip it, however the doctor wants to do it, just to make sure that it's permanent," before placing it back into the testicle and closing up the incision.

The parties' experts generally agreed that during Arroyo's vasectomy, Dr. Albertsen engaged in the previously mentioned procedure, except that instead of isolating, dissecting, and ligating the vas deferens, he performed these procedures on a portion of "vascular structures," i.e., a vein. Dr. Brodherson testified that, generally speaking, if blood flow to one of the multiple veins in the testicle becomes impeded, the testicle is not at risk of necrosis because of the many other veins that are still able to carry blood from the testicle. In contrast, if the blood flow through the testicular artery becomes impeded, the testicle will eventually die because this artery provides the organ with all of its essential nutrients.

Despite their agreement on the foregoing principles, the parties' experts disagreed on a critical point: how the lack of blood flow to Arroyo's left testicle, as reflected in the hospital's April 4, 2013 ultrasound results, occurred. On this issue, Dr. Brodherson testified: "[W]hen you're getting the vas [deferens] isolated, you've got to do some damage.[17] And when you cut it, you have to clean up the damage. . . . [B]ut [Dr. Albertsen] wasn't isolating the vas [deferens]; he was

isolating a medium-sized vein. And that is where he got into trouble. . . . [T]he vein and the arteries certainly run together [in the same sheath]. And in the process of isolating a vein, I'm sure some bleeding was provoked, which we expect. . . . And in the process of that, I'm sure anything bleeding in the area was cauterized to prevent—to effect hemostasis, which he says he did at the end of the procedure. And in one of the cauterization procedures, I'm sure the [testicular] artery was cauterized. . . . And there would have been no reason in his mind to think that was the testicular artery because he believed he was working on the vas [deferens]." (Footnote added.)

Dr. Brodherson explained that the testicular artery is more at risk if the physician is working on a vein instead of the vas deferens, stating: "When we do varicocele surgery and we remove veins, which is a procedure done for infertility, we use a dopplar in the operating room to make sure that it's a vein and not an artery. That's how delicate these things are. You can't really see them. And it's very possible to cut an artery or to sever an artery. . . . [W]e use the dopplar to identify the [testicular artery]. So, of course, if he had a dopplar—but he didn't know he was on a vein. He was dissecting a vein. He wasn't dissecting a vas [deferens]. Completely different structure." Because of Dr. Albertsen's wrong assumption about the structure he was working on, Dr. Brodherson reasoned that "he destroyed vital tissue because he was in the wrong part of that tiny area. . . . [T]he vas [deferens], well, that's a different neighborhood. And the artery unfortunately took a hit."

On the other hand, Dr. Glazier testified that the injury to Arroyo's testicular artery could not have occurred during the vasectomy on April 1, 2013, because the reported blood loss was too small and that the injury was the result of torsion that had occurred "a day or two following his vasectomy." Specifically, he testified that if Dr. Albertsen had destroyed the testicular artery during the vasectomy, there would have been "[s]ignificantly more" blood loss than the estimated "less than one milliliter" that he reported in his notes, because although the testicular artery is "not a huge artery," "[i]t's big enough. And if the patient had normal blood pressure, the pulsatile nature of the artery would break through the cautery seal and the patient will continue to bleed; if not at that moment, certainly within a short period of time." In contrast, Dr. Brodherson testified regarding the blood loss that a physician might not know if he had cauterized or otherwise injured an artery because of its small size and the fact that it may go into spasm, or "close down [its blood flow] for a second," upon any slight manipulation by the physician.

Dr. Glazier further opined that the necrosis of the left testicle must have been the result of torsion, which

"is a sudden loss of blood supply to the testicles usually by [the] twisting of the cord structures right above the testicle so that the blood flow is progressively diminished and subsequently cut off," that must have occurred sometime after the vasectomy on April 1, 2013, and before Arroyo went to the hospital on April 4, 2013. Dr. Brodherson testified, however, that he was "[a]bsolutely 100 percent" sure that this theory was not accurate.

More specifically, Dr. Brodherson testified that if torsion had occurred, the twisting of the cord would have killed "everything, the whole scrotal contents" of the left testicle, including the blood supply to the epididymis, a coiled structure on the top of the testicle that is a conduit for sperm. Because Dr. Murphy-Setzko, the physician who performed the orchiectomy on Arroyo, noted in her surgical pathology report and testified during her deposition that she observed Arroyo's epididymis as appearing "tan to pink and soft" and, thus, healthy on April 4, 2013, Dr. Brodherson reasoned that the blood supply to the epididymis was not affected by the injury, and, therefore, torsion could be ruled out as a potential cause of the necrosis.

Dr. Brodherson also pointed to several other factors that informed this opinion, including (1) Dr. Murphy-Setzko's operating notes expressly stating that the ultrasound suggested "lack of blood flow versus torsion," (2) her deposition testimony that she "did not see torsion" in the testicle,[18] and (3) the age of Arroyo. With regard to Arroyo's age, she stated that torsion is "out of the age group. I mean, it would be very unusual for a thirty-eight year old man, or forty, thirty-nine, whatever he was at the time. They don't get torsion. . . . I mean, you may get one in a million with torsion, but then you're just assuming this is the guy [who] just had a vasectomy and got torsion. And, you know, it's pretty coincidental. As you say, counselor, it stresses credulity. It's just ridiculous. Maybe one in—say, one in twenty, thirty, 40,000. So, you're telling us that this guy, poor gentleman not only just had a vasectomy, but then he—they're trotting out this diagnosis that doesn't even happen as a second coincidence? It just doesn't fit."

We next set forth the applicable standard of review and guiding principles of law for this claim. "Because the . . . claim challenges the sufficiency of the evidence, which is based on the court's factual findings, the proper standard of review is whether, on the basis of the evidence, the court's finding . . . was clearly erroneous. . . . In other words, a court's finding of fact is clearly erroneous and its conclusions drawn from that finding lack sufficiency when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm convic-

tion that a mistake has been committed. . . . Moreover, we repeatedly have held that [i]n a [proceeding] tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . Where there is conflicting evidence . . . we do not retry the facts or pass on the credibility of the witnesses. . . . The probative force of conflicting evidence is for the trier to determine." (Citations omitted; internal quotation marks omitted.) *State* v. *Trotman*, 68 Conn. App. 437, 441, 791 A.2d 700 (2002).

"[T]o prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury." (Internal quotation marks omitted.) *Gold* v. *Greenwich Hospital Assn.*, 262 Conn. 248, 254–55, 811 A.2d 1266 (2002). "Generally, expert testimony is required to establish both the standard of care to which the defendant is held and the breach of that standard." (Internal quotation marks omitted.) Id., 255. Likewise, "[e]xpert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person." *Milliun* v. *New Milford Hospital*, 310 Conn. 711, 725, 80 A.3d 887 (2013).

The defendants do not claim that there is insufficient evidence supporting the court's findings regarding the appropriate standard of care and Dr. Albertsen's deviation from that standard of care. Thus, we focus on the principles pertaining to causation. "All medical malpractice claims, whether involving acts or inactions of a defendant physician, require that a defendant physician's conduct proximately cause the plaintiff's injuries. The question is whether the conduct of the defendant was a substantial factor in causing the plaintiff's injury. . . . This causal connection must rest upon more than surmise or conjecture. . . . A trier is not concerned with possibilities but with reasonable probabilities. . . . The causal relation between an injury and its later physical effects may be established by the direct opinion of a physician, by his deduction by the process of eliminating causes other than the traumatic agency, or by his opinion based upon a hypothetical question. . . .

"To be reasonably probable, a conclusion must be more likely than not. . . . Whether an expert's testimony is expressed in terms of a reasonable probability that an event has occurred does not depend upon the semantics of the expert or his use of any particular term or phrase, but rather, is determined by looking at the entire substance of the expert's testimony." (Citation omitted; internal quotation marks omitted.) *Sargis* v. *Donahue*, 142 Conn. App. 505, 513, 65 A.3d 20, cert.

denied, 309 Conn. 914, 70 A.3d 38 (2013).

"[I]t is the plaintiff who bears the burden to prove an unbroken sequence of events that tied his injuries to the [defendants' conduct]. . . . This causal connection must be based upon more than conjecture and surmise." (Citations omitted; internal quotation marks omitted.) *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 25–26, 734 A.2d 85 (1999). A plaintiff, however, "is *not* required to disprove all other possible explanations for the accident but, rather, must demonstrate that it is more likely than not that the defendant's negligence was the cause of the accident." (Emphasis added.) *Rawls* v. *Progressive Northern Ins. Co.*, 310 Conn. 768, 782, 83 A.3d 576 (2014). "[T]he issue of causation in a negligence action is a question of fact for the trier . . . ." (Internal quotation marks omitted.) *Burton* v. *Stamford*, 115 Conn. App. 47, 87, 971 A.2d 739, cert. denied, 293 Conn. 912, 978 A.2d 1108 (2009).

In the present case, the defendants argue that because the only expert opinion supporting the plaintiffs' cauterization theory was from Dr. Brodherson, and because Dr. Brodherson's opinion that Dr. Albertsen cauterized the testicular artery was "rank speculation," the plaintiffs did not meet their burden of proving causation. We are unpersuaded by this argument.

First, Dr. Brodherson's testimony on causation relied on substantial evidence that was largely unchallenged by the defendants. Specifically, it was undisputed that Dr. Albertsen mistook a vein for the vas deferens during the vasectomy, as proven by the results of the two separate pathology reports admitted at trial. It was also uncontroverted by the results of the ultrasound performed at the hospital on April 4, 2013, that there was no blood supply to the left testicle, which is "tantamount to testicular death," and, as Dr. Brodherson testified, the testicle's main source of nutrients via blood supply is the testicular artery.

Furthermore, the plaintiffs showed that as a result of Dr. Albertsen's misidentification of the vas deferens, he was working perilously close to the testicular artery. The defendants assert in their brief that Dr. Brodherson "provided no explanation as to why mere proximity to the veins was sufficient to conclude that the artery was injured." To the contrary, Dr. Brodherson explained several times during his testimony why the testicular artery is significantly more at risk if one is performing surgery on a vein as opposed to the vas deferens, emphasizing that the veins and artery run close together in the same sheath in the spermatic cord. He testified that the artery is extremely delicate and that it is so small, "[y]ou can't really see [it]." He also described in detail the highly specialized piece of equipment, i.e., a dopplar, that physicians utilize when they are operating on the veins near the artery for other types of urologic procedures, such as a varicocelectomy. Dr. Brodherson

explained how the dopplar helps physicians to identify and visualize the artery so that they are able to protect it from dissection and cauterization during these procedures, and stated that Dr. Albertsen, in the present case, essentially "[performed] a varicocelectomy without having a dopplar," a very precarious act because of the risk of loss of blood flow posed to the testicle.

Ultimately, Dr. Brodherson supported his opinion on causation through the process of "differential diagnosis," which is "a method of diagnosis that involves a determination of which of a variety of possible conditions is the probable cause of an individual's symptoms, often by a process of elimination." *DiLieto* v. *County Obstetrics & Gynecology Group*, *P.C.*, 297 Conn. 105, 114 n.13, 998 A.2d 730 (2010). The only two possible causes of Arroyo's necrotic left testicle that were offered by the experts at trial were the cauterization theory testified to by Dr. Brodherson and the torsion theory. As previously discussed herein, Dr. Brodherson considered and rejected the latter as a possible cause of the injury based soundly on the evidence that the epidydimis contained blood flow at the time Dr. Murphy-Setzko performed the orchiectomy on April 4, 2013. As Dr. Brodherson testified, Arroyo's healthy epidydimis "is the nail that . . . shuts the coffin. Because the epididymis would have been dead had it been torsion." In other words, Dr. Brodherson established the causal relation between the injury and its later physical effects "by his deduction by the process of eliminating causes other than the traumatic agency," as is permitted by our case law. (Internal quotation marks omitted.) *Sargis* v. *Donahue*, supra, 142 Conn. App. 513; see also *Ward* v. *Ramsey*, 146 Conn. App. 485, 490–91, 77 A.3d 935, cert. denied, 310 Conn. 965, 83 A.3d 345 (2013).

In contrast, Dr. Glazier's expert opinion on why Arroyo's necrotic left testicle must have been caused by torsion was based largely on the fact that Dr. Albertsen did not report that there was any significant bleeding during the vasectomy. Dr. Brodherson's testimony, however, refuted that there always will be significant bleeding if the artery is injured because, in some cases, the artery will be in spasm, and, thus, less blood will be flowing through it. The court was free to credit Dr. Brodherson's explanation.

Dr. Glazier also opined that the most likely explanation was torsion because there was no indication during the orchiectomy that the artery was severed, as there was no indication that Dr. Murphy-Setzko had observed the testicular artery at all.[19] In contrast to this, however, Dr. Brodherson testified that the fact that Dr. Murphy-Setzko stated that she could not find the artery during the procedure is "a complete diversion" and did not surprise him "[b]ecause it had been previously injured, cauterized. And—first of all, why would you look for it? And second of all, you're never going to find it. The

thing died four days ago. It's retracted in. It's black like everything else. So, it's completely irrelevant. There's no need to find the artery. I mean, you couldn't find it."

As this court has held many times over, "[c]onflicting expert testimony does not necessarily equate to insufficient evidence." (Internal quotation marks omitted.) *Dallaire* v. *Hsu*, 130 Conn. App. 599, 603, 23 A.3d 792 (2011). Rather, "[w]here expert testimony conflicts, it becomes the function of the trier of fact to determine credibility and, in doing so, it could believe all, some or none of the testimony of either expert." (Internal quotation marks omitted.) *DelBuono* v. *Brown Boat Works, Inc.*, 45 Conn. App. 524, 541, 696 A.2d 1271, cert. denied, 243 Conn. 906, 701 A.2d 328 (1997). Thus, in the present case, the court, as the trier of fact, certainly was free to reject the defendants' theory of torsion and to credit the opinion of the plaintiffs' expert that the testicular artery was cauterized during Dr. Albertsen's dissection and ligation of the vein.

In sum, we highlight that in order to prove causation, a plaintiff "must demonstrate that it is more likely than not that the defendant's negligence was the cause of the accident." *Rawls* v. *Progressive Northern Ins. Co.*, supra, 310 Conn. 782. "[T]he issue of causation in a negligence action is a question of fact for the trier . . . ." (Internal quotation marks omitted.) *Burton* v. *Stamford*, supra, 115 Conn. App. 87. We agree with the plaintiffs that the court's finding was not clearly erroneous in that regard. Accordingly, we conclude that the court properly determined that the plaintiffs had satisfied their burden of proving that Dr. Albertsen injured Arroyo's testicular artery and, thus, caused the necrosis of Arroyo's left testicle.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In this opinion, we refer to Jose as Arroyo and to his wife, Marie Arroyo, as Marie.

[2] Specifically, the court initially awarded Arroyo $36,249.81 in economic damages and $300,000 in noneconomic damages on his medical malpractice claim, and awarded Marie $50,000 in damages on her loss of consortium claim. The court thereafter granted the defendants' motion for a collateral source reduction and reduced Arroyo's economic damages award to $20,383.44.

[3] The commissioner at that time was J. Paul Vance, Jr.

[4] A "necrotic" testicle refers to the death of the tissues in the testicle, which is tantamount to the death of the testicle itself.

[5] General Statutes § 4-147 provides in relevant part: "Any person wishing to present a claim against the state shall file with the Office of the Claims Commissioner a notice of claim . . . ."

[6] We note that although § 4-160 has been amended since the events at issue, those amendments are not relevant to this appeal. For convenience, we refer in this opinion to the current revision of § 4-160.

[7] General Statutes § 52-190a (a) provides in relevant part: "No civil action or apportionment complaint shall be filed to recover damages resulting from personal injury or wrongful death occurring on or after October 1, 1987, whether in tort or in contract, in which it is alleged that such injury or death resulted from the negligence of a health care provider, unless the attorney or party filing the action or apportionment complaint has made a reasonable inquiry as permitted by the circumstances to determine that there are grounds for a good faith belief that there has been negligence in the care

or treatment of the claimant. The complaint . . . shall contain a certificate of the attorney or party filing the action or apportionment complaint that such reasonable inquiry gave rise to a good faith belief that grounds exist for an action against each named defendant. . . . To show the existence of such good faith, the claimant or the claimant's attorney . . . shall obtain a written and signed opinion of a similar health care provider, as defined in section 52-184c . . . that there appears to be evidence of medical negligence and includes a detailed basis for the formation of such opinion. . . .''

[8] As Dr. Glazier testified, torsion "is a sudden loss of blood supply to the testicles usually by [the] twisting of the cord structures right above the testicle so that the blood flow is progressively diminished and subsequently cut off.''

[9] The defendants filed a motion to reargue/reconsider, which the court denied. They do not challenge that ruling on appeal.

[10] Because sovereign immunity implicates the court's subject matter jurisdiction, it may be raised at any time, including for the first time on appeal. See *Vejseli* v. *Pasha*, 282 Conn. 561, 575 n.12, 923 A.2d 688 (2007).

[11] As Dr. Brodherson testified at trial, cauterization is "the use of high intensity heat. . . . [I]t destroys the tissue to the point—it's a sealant, actually. If we use it on blood vessels, it will seal an artery if it's a small artery . . . . Or it can actually also cut . . . . If it's a small vessel . . . it burns it, it closes it, it seals it. It has an odor to it and you see smoke coming out of it. But the main thing is that the bleeding will stop.''

[12] Specifically, Dr. Brodherson testified that "the vein and the arteries certainly run together. And in the process of isolating a vein, I'm sure some bleeding was provoked, which we expect. . . . And in the process of that, I'm sure anything bleeding in the area was cauterized to prevent—to effect hemostasis, which [Dr. Albertsen] says he did at the end of the procedure. And in one of the cauterization procedures, I'm sure the artery was cauterized.''

[13] General Statutes § 4-160 (a) provides: "Whenever the Claims Commissioner deems it just and equitable, the Claims Commissioner may authorize suit against the state on any claim which, in the opinion of the Claims Commissioner, presents an issue of law or fact under which the state, were it a private person, could be liable.''

[14] We note that both experts testified at trial that the dissected section of "vascular structures'' referred to in the pathology reports was, in fact, a vein.

[15] According to Dr. Brodherson's testimony, to "ligate'' something is "to bind it or to tie it up.''

[16] Dr. Brodherson testified that "[t]he point of . . . isolating the vas [deferens] [is] . . . we really only want to tie off the vas [deferens]. We don't want to tie off other structures, especially an artery. . . . [T]he vas [deferens] has to be isolated and it has to be on its own.''

[17] Dr. Brodherson had previously testified that the process of isolating the vas deferens is occasionally "unpleasant'' for the patient and "difficult'' for the physician because the physician has to manipulate the patient's tissue in order to discover the vas deferens beneath the skin, move what he believes to be the vas deferens toward the surface of the skin, and make an incision in order to access the structure and complete the vasectomy. He stated that sometimes, however, after the incision is made, the structure that was manipulated is not, in fact, the vas deferens, "[s]o then we have to go digging around. And the skin is already open. You're getting bleeding. And you find—looking for it and the patient's squirming. I mean, this is not a walk in the park usually, often. But then we'll dig deeper sometimes. Sometimes it's a snap. Sometimes the patient has very thin skin. You can almost see it. . . . And then there's these others—it could be on the same patient— where it can take twenty minutes just to isolate.''

[18] We note that during her deposition testimony, Dr. Murphy-Setzko declined to offer any opinions on the issue of standard of care.

[19] The defendants also tried to make the argument that the code that Dr. Murphy-Setzko used on her hospital reports for Arroyo, indicating that his diagnosis was "testicle torsion,'' lent support to their theory that torsion was the cause. Significantly, however, Dr. Murphy-Setzko testified herself that she merely used this code because the hospital's record system did not provide a code for vascular injury, and she "had to pick what's the next closest thing.''